IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-02175-PAB

DELMART E. J. M. VREELAND, III,

v.

DAVID ZUPAN, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

Respondents.

---

## ORDER ON APPLICATION FOR
## WRIT OF HABEAS CORPUS

---

## I. BACKGROUND

Applicant Delmar E. J. M, Vreeland, III, filed *pro se* an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 that challenges the validity of his criminal conviction in Case No. 04CR706 in the District Court for Douglas County, Colorado. Applicant originally filed the Application on August 6, 2014, but then, pursuant to the August 11, 2014 Order to Amend, he filed an Amended Application, Docket No. 8, on September 29, 2014.   The September 29 Amended Application, which asserts thirty-two claims, of which one has five subparts, is the operative pleading in this action.

On September 29, 2014, Magistrate Judge Gordon P. Gallagher directed Respondents to file a Pre-Answer Response and to address the affirmative defenses of timeliness under 28 U.S.C. § 2254(d), and exhaustion of state court remedies under 28 U.S.C. 2254(b)(1)(A), if Respondents intended to raise either or both in this action.

After granting both parties extensions of time, Respondents filed a Pre-Answer Response and Applicant filed a Reply.   Magistrate Judge Gallagher reviewed the Response and Reply and directed Applicant to show cause why the action should not be dismissed as a mixed petition.   On March 4, 2015, counsel entered an appearance on Applicant's behalf and requested a ninety-day extension of time to respond to the Order to Show Cause.   Magistrate Judge Gallagher granted the request for an extension of time, but allowed Applicant only sixty days to respond.   Applicant filed a Response, Docket No. 32, on May 1, 2015, and Respondents filed a Reply, Docket No. 34, on May 19, 2015.

This Court, upon review of the Response to the Order to Show Cause and Applicant's Reply, filed an Order to Dismiss in Part and for Answer on December 21, 2015.   *See* Docket No. 46.   In the December 21 Order, the Court determined that Claims Six through Nine, Eleven through Twenty-Six, subpart (a) of Twenty-Seven, Twenty-Nine, and Thirty are procedurally barred from federal habeas review.   Docket No. 46 at 19.   The Court further determined that Claims Four, Thirty-One, and Thirty-Two are not cognizable in a federal habeas action, and subparts (b)-(e) of Claim Twenty-Seven and Claim Twenty-Eight are unexhausted.   *Id.*

The remaining claims are as follows:

> 1) Trial court forced Applicant to jury trial without counsel and notification in violation of Sixth Amendment;
>
> 2) Trial court forced Applicant to trial without counsel even though Applicant was incompetent violating due process rights;
>
> 3) Trial court denied a competency hearing violating due process rights;

2

> 5) Jury instructions did not include the date and location of the crime violating due process rights; and
>
> 10) Trial court failed to limit the use of certain evidence under "CRE 404(B) and C.R.S. § 16-10-301" by the jury regarding the age of state witnesses, [J.O. and L.A.][1], and when they first met Applicant in violation of the Sixth and Fourteenth Amendments.

Docket No. 8 at 14-16, 20.

Respondents then were directed to file an answer that fully addresses the merits of Claims One through Three, Five, and Ten. *Id.* at 20. Respondents requested an extension of time to file an answer, which was granted. Prior to Respondents filing an answer, Applicant filed a Motion to Amend or Reconsider Ruling. *See* Docket No. 53. In the Motion to Amend or Reconsider, Applicant requests that the Court alter, amend, or reconsider the December 21 ruling and allow Applicant to litigate his actual innocence claim "in conjunction with his claims that he was forced to trial without counsel, and while incompetent, in violation of his Sixth Amendment rights" in this action. *See* Docket No. 53 at 7-8. Respondents filed a Response to Motion to Reconsider, Docket No. 55, on January 25, 2016, and Applicant filed a Reply to State's Response to Motion to Amend or Reconsider, Docket No. 59, on February 8, 2016.

Subsequently, Respondents filed an Answer on February 16, 2016, addressing the merits of Claims One through Three, Five, and Ten. Docket No. 60. Applicant filed a Reply to the Answer, Docket No. 65, on March 31, 2016, and an Amended Reply, Docket No. 68, on April 21, 2016. The case was stayed from March 16, 2016 until May 2, 2016 because Applicant appealed this Court's denial of his request for bail and the state

---

[1] The Court refers to alleged victims of sexual assaults by their initials in this Order.

court records were not available to this Court until the Tenth Circuit returned the records

following the disposition of Applicant's appeal.   The Court, on September 9, 2016,

denied the Motion to Amend or Reconsider Ruling.

The factual background of Applicant's crimes and convictions is summarized in the

opinion of the Colorado Court of Appeals (CCA), addressing his direct appeal as follows:

> Defendant, Delmart Michael Edward Vreeland, appeals the judgment of conviction entered upon jury verdicts finding him guilty of inducement of child prostitution, solicitation of child prostitution, sexual exploitation of children, sexual assault, contributing to the delinquency of a minor, and distribution of a controlled substance.
>
> We affirm.
>
> I. Background
>
> Defendant promised to pay two teenage boys if they allowed him to photograph them in their underwear and post the photographs on a pornographic website.   After providing the teenagers with alcohol and cocaine, defendant took photographs of the boys and sexually assaulted them.

Docket No. 17-2 at 2.

## II. ANALYSIS

### A. Standard of Review

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued

with respect to any claim that was adjudicated on the merits in state court unless the state

court adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4

28 U.S.C. § 2254(d).   Applicant bears the burden of proof under § 2254(d).   *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

A claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim.   *Harrington v. Richter*, 562 U.S. 86, 98 (2011).   In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."   *Id.* (collecting cases).   Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."   *Id.* at 99.   "Where there has been one reasoned state judgment rejecting a federal claim," federal habeas courts should presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."   *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."   *Id.* at 98.   In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated."   *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).   Therefore, this Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of

the facts in light of the evidence presented." *Id.* at 1178.   "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1).   *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).   The threshold question the Court must answer under § 2254(d)(1) is whether Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final.   *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).   Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.   Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice.   Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).   If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1).   *See id.* at 1018.

If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.   *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are

6

> materially indistinguishable from a decision of the Supreme
> Court and nevertheless arrives at a result different from [that]
> precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th
> Cir. 2006)] (internal quotation marks and brackets omitted)
> (quoting *Williams*, 529 U.S. at 405).   "The word 'contrary' is
> commonly understood to mean 'diametrically different,'
> 'opposite in character or nature,' or 'mutually opposed.' "
> *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable
> application of clearly established federal law when it identifies
> the correct governing legal rule from Supreme Court cases,
> but unreasonably applies it to the facts.   *Id.* at 407-08.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an

objective inquiry.   *See Williams*, 529 U.S. at 409-10.   "[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or

incorrectly.   Rather that application must also be unreasonable."   *Id.* at 411.   "[A]

decision is 'objectively unreasonable' when most reasonable jurists exercising their

independent judgment would conclude the state court misapplied Supreme Court law."

*Maynard*, 468 F.3d at 671.   The Supreme Court has also stated:

> [E]valuating whether a rule application was unreasonable
> requires considering the rule's specificity.   The more general
> the rule, the more leeway courts have in reaching outcomes in
> case-by-case determinations.   [I]t is not an unreasonable
> application of clearly established Federal law for a state court
> to decline to apply a specific legal rule that has not been
> squarely established by [the Supreme] Court.

*Richter*, 562 U.S. at 101 (internal quotation marks omitted).   In conducting this analysis,

the Court "must determine what arguments or theories supported or . . . could have

supported[] the state court's decision" and then "ask whether it is possible fairminded

7

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.   In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *v. Pinholster*, 563 U.S. 170, 181 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 562 U.S. at 102 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2).   *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court.   Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Applicant bears the burden of rebutting the presumption by clear and convincing evidence.   "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' "   *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). "Unless the error is a structural defect in the trial that defies harmless-error analysis, [the Court] must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . ." *Id.*; *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review). Under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Bland*, 459 F.3d at 1009 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.

The Court makes this harmless error determination based upon a review of the entire state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000). "In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis v. Ayala*, 576 U.S. ---, 135 S. Ct. 2187, 2199 (2015) (citing *Fry*, 551 U.S. at 119-120).

If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim de novo and the deferential standards of § 2254(d) do not apply.   *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

### B. Merits of Claims

#### 1. *Claim One*

In Claim One, Applicant asserts that he was forced to represent himself at trial over his objections and in violation of his Sixth Amendment rights.   Docket No. 8 at 14. Applicant further asserts that he refused to waive counsel, did not waive counsel, but was forced to go to trial without counsel over his objections.   *Id.*

In addressing this claim, the CCA found as follows:

II. Right to Counsel

Defendant contends that his constitutional right to counsel was violated because he was forced to represent himself during trial. We disagree.

A. Law

The fundamental right to the assistance of counsel is constitutionally guaranteed by the Sixth Amendment.   U.S. Const. amend. 6; *see* Colo. Const. art. II, § 16; *People v. Alengi*, 148 P.3d 154, 159 (Colo. 2006).   A defendant also has a correlative constitutional right to self-representation. *Alengi*, 148 P.3d at 159.   That right may be asserted affirmatively or by inference when the defendant declines to be represented by counsel.   *Id.*

Before proceeding pro se, a defendant must knowingly, intelligently, and voluntarily waive his constitutional right to counsel.   *People v. Bergerud*, 223 P.3d 686, 693 (Colo. 2010); *People v. Krueger*, 2012 COA 80, ¶ 13.   A defendant may waive assistance of counsel either expressly or impliedly through his or her conduct.   *Alengi*, 148 P.3d at 159.   An implied waiver occurs when the defendant is deemed to have forfeited the right to counsel, as opposed to having made a deliberate decision to forgo the right.   *Id.*

10

"Courts must ascertain whether, under the totality of the circumstances, a defendant's conduct evinces a voluntary, knowing, and intelligent waiver of right to counsel." *Id.* "A defendant's pattern of obstreperous, truculent, and dilatory behavior may be deemed relevant as to whether such conduct has been undertaken with full awareness of the consequences of doing so." *Id.*; *see also People v. Tellez*, 890 P.2d 197, 198 (Colo. App. 1994) ("the defendant cannot delay his [or her] trial indefinitely under the guise of seeking counsel").

Whether a defendant effectively waived his right to counsel is a mixed question of fact and law that we review de novo. *Bergerud*, 223 P.3d at 693; *Krueger*, ¶ 15.

## B. Trial Court Proceedings

Five attorneys, in succession, represented defendant before trial, and each requested and was granted permission to withdraw from that representation. After the trial court granted the fourth attorney's request to withdraw, defendant said he did not want to be represented by counsel and that he wanted to proceed pro se. The court then gave defendant a thorough *Arguello* advisement regarding his decision to represent himself. *See People v. Arguello*, 772 P.2d 87, 95-96 (Colo. 1989). Defendant repeatedly said he wanted to represent himself.

Defendant reaffirmed his decision to represent himself at the next two pretrial hearings. On February 22, 2006, defendant asked for a continuance and waived his right to speedy trial so that he could hire advisory counsel to help him review discovery.

At a pretrial hearing three weeks before the new trial date, defendant again asked for a continuance to hire advisory counsel to help him review discovery. The prosecution expressed concern that although defendant appeared *pro se* and said he wanted to represent himself, he was, at the same time, writing letters to the court saying he wanted to be represented by counsel. During the hearing, defendant affirmed that he wanted to represent himself and said he wanted to hire advisory counsel to help him when he testified at trial. The court denied defendant's request for a continuance.

Two weeks before trial, defendant's fifth attorney entered an appearance and asked for a continuance to prepare for trial. The court granted the request over the prosecution's objection. The court expressed concern "that there is a manipulative aspect of this that is very obvious to the Court." The court found that the "past history of this case, as

11

articulated by [the prosecutor], speaks to the issue of there being an attempt to avoid the ultimate resolution of this case before a jury."

A few days before trial, defendant's fifth attorney filed a motion to withdraw.   The court granted counsel's motion to withdraw, finding a conflict of interest had arisen.   The court then considered, and denied, defendant's motion for a continuance.

The court noted that during defendant's competency evaluation, the interviewer determined that defendant had "a working knowledge of the legal system that surpassed [that of] most individuals" and "a distinctly acute understanding of the proceedings against him."   The interviewer's diagnostic impression of defendant was that he "appears to use the means available to him in the moment to accomplish his goals, including threatening suicide, threatening litigation, and intimidating those around him."   The interviewer concluded that defendant's "ability to work with his attorney to develop the best defense possible is not an issue."

The court found that defendant was "highly intelligent," had a long history of conflict with his counsel, and had attempted to intimidate the court through use of profanity.   The court also found that defendant "has an extremely high interest in exercising control, manipulating and dominating." The court summarized defendant's history with counsel as follows:

> What's clear to the Court is that the pattern in this case is quite
> stark and is quite clear: Mr. Vreeland, while having the ability
> to certainly retain counsel, retains counsel, inescapably
> enters into a conflict, fires that lawyer, and has to seek to
> retain new counsel; it's occurred with [the former attorneys].

The court found that defendant, "when he was *pro se*, was adamant, adamant in his desire to represent himself" and that his "pro se pleadings reflect a persistent, adamant desire to represent himself."   The court further found that defendant "has obviously manifested a desire to represent himself in the past," including after extensive *Arguello* advisements.

On the morning of trial, a sixth attorney tried to enter a "conditional entry of appearance," in which he agreed to enter an appearance if the court granted a continuance for him to prepare for trial.   The court denied the "conditional" entry of appearance because no such motion exists under Colorado law.   The court also denied defendant's motion to continue the trial based on his past manipulation of the process.   Counsel did not enter an appearance to represent defendant; instead, he acted as defendant's advisory counsel during trial.

C. Analysis and Conclusion

The record amply supports the trial court's findings that defendant waived his right to counsel.   *See Alengi*, 148 P.3d at 159.   Defendant said repeatedly that he wanted to proceed *pro se*, including after extensive *Arguello* advisements about the consequences of his decision to do so.   In addition, defendant repeatedly said both orally and in writing that his intention was to represent himself and that counsel had been "forced upon him."

In addition, the totality of the circumstances shown in the record also demonstrates that defendant's actions impliedly waived his right to counsel. *See id.*   Most, if not all, of the delay in bringing the case to trial was a result of defendant's repeated failure to maintain a working relationship with counsel.   *See Tellez*, 890 P.2d at 198.   In addition, the record shows that defendant had a pattern of threatening counsel, filing meritless motions, and firing counsel as the date of trial approached.   Such behavior supports the conclusion that defendant, who is "highly intelligent," was manipulating the legal system with full awareness of the consequences of what he was doing.   *See Alengi*, 148 P.3d at 159.

Accordingly, we conclude defendant's right to counsel was not violated.

Docket No. 17-2 at 2-8.

In the Reply, Docket No. 68, at 22-23, Applicant argues that he revoked his waiver of counsel and reasserted his right to counsel in June of 2006.   Applicant further argues that the trial court allowed and encouraged Applicant's reassertion of the right to counsel when it allowed Joseph Scheideler to enter as counsel of record.   Docket No. 68 at 22. Applicant contends that from June 2006 forward he did not waive, expressly or implicitly, his right to counsel, and the trial court never warned Applicant that the earlier waiver of the right would somehow be revived against him.   *Id.* at 22-23.

Applicant also asserts that the first attorney was hired by his family only for the purpose of the bond hearing and the second attorney was appointed by the trial court, but

withdrew when she learned Applicant was hiring private counsel.   *Id.* at 17.   Applicant

further asserts that there was no indication of conflict, wrongdoing, or manipulation with

either of these attorneys.   *Id.*   Applicant also contends that his third attorney moved to

withdraw based on a "cryptic" irreconcilable differences, but there was no indication,

allegation, or finding of manipulation or misconduct by Applicant.   *Id.*   As for the fourth

attorney, Applicant asserts that his withdrawal was based on vague and uncertain factual

circumstances, which included his representation of another defendant, but no findings

were made to determine that Applicant caused the withdrawal.   *Id.*

Applicant concedes the withdrawal of the fifth attorney did include a factual

dispute, but he asserts the trial court refused to investigate the details of the dispute and

imputed the blame for withdrawal on Applicant.   *Id.* at 17-18.   Applicant contends he did

not waive his right to counsel when the fifth attorney withdrew, but he reasserted his right

to counsel and made clear he could not try the case *pro se*.   *Id.* at 18.

Applicant asserts, when he hired a sixth attorney and that attorney requested a

continuance to prepare for trial, the trial court's denial of the continuance violated

Applicant's right to counsel.   *Id.* at 28-29.   Applicant claims the trial court ruled that he

had waived his right to counsel without first warning him that his conduct might lead to a

waiver and without conducting an actual hearing.   *Id.*   Applicant also contends that he

was represented by his fifth attorney up to November 17, 2006, when he withdrew eleven

days before trial.   *Id.* at 25.   Applicant further contends that at this time he expressed to

the trial court he could not try the case by himself.   Applicant states that the only time he

expressed a willingness to proceed *pro se* was when his fourth attorney withdrew on

February 8, 2006.   *Id.*

14

The Court has reviewed the state court record to clarify when each attorney entered an appearance on Applicant's behalf and then subsequently withdrew, and the circumstances surrounding the withdrawals.   The Court finds as follows:

On October 18, 2004, Declan J. O'Donnell entered an appearance on behalf of Applicant in Criminal Case No. 04CR706 in the District Court for Douglas County, Colorado.   Case No. 04CR706 Court File at 000055.   Mr. O'Donnell filed a motion to withdraw as Applicant's attorney on October 25, 2004 because Applicant had (1) misrepresented his named as Barry Clayton Steeves; (2) posted a $100,000 surety bond for a $15,000 fee, which the monies were from a stolen credit card; (3) absconded from Colorado; (4) a no bond hold in Michigan; (5) numerous warrants pending for theft; and (6) caused the retainer to be executed on fraudulent grounds.   *Id.* at 000107.   The motion to withdraw was granted on December 3, 2004.   *Id.* at 000126.   A notice of the motion to withdraw was waived because Applicant had absconded and his whereabouts were unknown.   *Id.*

On February 3, 2005, Magistrate Judge Marker, in the County Court for Douglas County, Colorado, determined Applicant was indigent and ordered a private attorney, Juliet Miner, appointed because a co-defendant was represented by the public defender. *Id.* at 000141.   Ms. Miner entered an appearance on February 8, 2005 and filed a motion for discovery.   *Id.* at 000142.   At a bond hearing on February 17, 2005, Ms. Miner informed the trial court that Applicant had asked her to withdraw as his attorney because he was hiring a private attorney and she was "not doing what he believes he needs to be doing."   Feb. 17, 2005 Hr'g Tr. at 2.   Judge Marker then had a colloquy with Applicant as follows:

15

THE COURT: All right, Mr. Vreeland what are your intentions regarding hiring your own counsel?

MR. VREELAND: I hired my own counsel before I was even brought here.   But both Courts had told me that I don't have a right to contact them and we both know that that's been on the record.   So what I did is I filed a motion up in the Federal Court in Denver.   I, I have the right to have my own counsel, I have the right to retain, I hired Steve Goodwin and I hired Tom Henry.   Both this Court and Judge King said I don't have the right to communicate with them.   So now what I'm doing is I'm using someone else, I'm going to retain Steinberg and I'm going to have Tom Henry - -

THE COURT: And how do you plan on doing that Mr. Vreeland?

MR. VREELAND: How do I plan on what?

THE COURT: Hiring Mr. Steinberg?

MR. VREELAND: My family's going to hire them why, I don't think how I retain somebody is important, the fact that--

THE COURT: Okay, well don't tell me what's important, okay?

MR. VREELAND: Your Honor I'm hiring my own attorney and there's nothing you can do about it, that's that.   I'm hiring my own counsel.

THE COURT: Okay, we're done.

MR. VREELAND: That's it, you're right.

THE COURT: Ms. Miner you will have to continue representing him until someone else answers, all right?

*Id.* at 3-4.

Ms. Miner appeared on Applicant's behalf at the February 24, 2005 hearing, during which the preliminary hearing was continued until Mr. Steinberg had been retained and would hopefully appear.   Feb. 24, 2005 Hr'g Tr. at 3.   On March 8, 2005, Harvey A. Steinberg entered an appearance, on behalf of his firm, and requested discovery.   Case No. 04CR706 Court File at 000143.   On March 10, 2005, an entry of appearance was

16

made by Adam Tucker, an attorney in Mr. Steinberg's firm.   Mar. 10, 2005 Hr'g Tr. at 2-3.

On March 11, 2005, Applicant submitted a letter to Judge Marker and asked that he be

allowed to waive counsel and enter a plea because of the conditions of his confinement.

*Id.* at 000151-57.

However, on May 12, 2005, Applicant appeared at the preliminary hearing with Mr.

Steinberg and Mr. Leach, apparently another attorney from Mr. Steinberg's firm.   May

12, 2005 Prelim. Hr'g.   At the end of the hearing, Applicant chose to speak on his behalf,

against the recommendation of his attorney, *id.* at 144 (page 31 of the hearing transcript),

regarding the $1 million dollar bond the court was setting.   Applicant was argumentative

with the judge, accused her of being prejudicial because she had been a district attorney,

and asked the judge to recuse herself, even though he was represented by counsel at the

time.   *Id.* at 153-54 (pages 40-41 of the hearing transcript).

Then on May 12, 2005, May 27, 2005, and June 15, 2005, Mr. Steinberg filed three

motions to reduce bond.   Case No. 04CR706 Court File at 000189, 193, 195.   On June

17, 2005, a motion for extension of time to brief the issuance of bail was filed by Matthew

T. Berumen on behalf of Applicant.   *Id.* at 000197.   On July 26, 2005, Mr. Steinberg filed

a motion to withdraw and a notice of withdrawal.   *Id.* at 000202-204.   In the motion to

withdraw, Mr. Steinberg asserts that he and Applicant had developed irreconcilable

differences with regard to Mr. Steinberg's representation.   *Id.* at 204.   In the notice of

withdrawal, Mr. Steinberg informed Applicant, in particular, that (1) a hearing would be

scheduled on the motion to withdraw; (2) he had a right to object to the withdrawal; and (3)

withdrawal will be allowed if approved by the court.   *Id.* at 000202-203.

On September 13, 2005, a hearing was held to address Mr. Steinberg's motion to

withdraw.   The colloquy between the court, Mr. Steinberg, and Applicant was as follows:

THE COURT: And you have a motion to withdraw?

MR. STEINBERG: Correct.

THE COURT: Anything you care to add?

MR. STEINBERG: No, Your Honor.

THE COURT: Mr. Vreeland, your position with respect to the motion to withdraw?

MR. VREELAND: He needs to withdraw.

THE COURT: That request is granted.

MR. STEINBERG: Thank you.

MR. VREELAND: Can I ask you a question?

THE COURT: Go ahead.

MR. VREELAND: About a month ago I had two attorneys, two firms, ask Mr. Steinberg for the discovery and legal materials but he won't give up either.   I won't use the words he used.   You have told me not to swear to the court.   He refused to give up anything.

THE COURT: It sounds to me like you are having an issue with Mr. Steinberg and the retention of discovery; is that correct?

MR. VREELAND: That and money that I gave him.   There is [a] man from the Supreme Court his name is -- I can't remember.   He is an attorney for counsel regulation.   He told me to bring it up to the Court.   What happen so far is he started a complaint.   Harvey, he refuses to give up any of the money at all.   He kept way more money than he was supposed to keep.   He is refusing to give up discovery.   It's been way over a month since this happened.

THE COURT: With respect to that issue, thank you for bringing it to my attention.   If there are disciplinary issues they will resolve that.   With respect to the discovery question, if you retain new counsel and the court

18

appoints new counsel to represent you, they will get discovery either through Mr. Steinberg or through the DA's Office.

    MR. VREELAND: They have and they are being denied.

    THE COURT: Who is your new lawyer?

    MR. VREELAND: Shawn [sic] Young and Tom Henry.

Sept. 13, 2005 Hr'g Tr. at 2-3.

Following the September 13 Hearing, the next hearing was held on September 22, 2005, during which attorney Sean Young appeared on behalf of Matthew Berumen. The colloquy between the court and Mr. Young at the September 22 hearing was as follows:

    THE COURT: All right. Mr. Young, are you entering your appearance then on behalf of Mr. Vreeland at this point?

    MR. YOUNG: Actually, I'm not.   I'd like to see the document that entered our appearance on this in the first place, because he originally had Harvey Steinberg on this case, and I don't know how our law firm got on the case.   We had him for a bond issue on a separate issue, and somehow our name got on the record for this case, which is a criminal case, and obviously there's some sort of entry, because now today Mr. Thomas Henry --- I'm entering appearance for Mr. Henry and appearing for him today.   He's recently been licensed in the State of Colorado, and entering appearance for him and trying to withdraw ourselves, because we never entered our appearance on this specific case.

    THE COURT: All right.   Well, actually, we don't have you entering on this case.

    MR. YOUNG: Okay, good.

    THE COURT: We have Mr. Steinberg, who the Court permitted to withdraw last time, and Mr. Vreeland indicated to the Court that you would be his lawyers on this case.   So my clerk contacted you advising the matter was set over today for appearance of counsel.

Sept. 22, 2005 Hr'g Tr. at 2-3.

On September 21, 2005, Thomas E. Henry made an entry of appearance as counsel for Applicant.   Case No. 04CR706 Court File at 000263.   Mr. Henry, thereafter, filed several motions for the presiding judge to recuse, a motion for continuance, a motion to evaluate Applicant's competency, a motion for an independent evaluation, discovery motions, request that author of laboratory report testify, a motion to dismiss for violation of speedy trial rights, motion to allow independent examination, motion to dismiss for violation of attorney/client privilege, a motion for dismissal of habitual criminal counts, and a motion to specify Rule 404 evidence.   *Id.* at 000264, 266, 276, 282, 294, 300, 305, 306, 308, 311, 313, 316, 319, 324, 326, 328, 331, 333, and 338.

At the January 27, 2006 hearing, Mr. Henry, in support of the motion for speedy trial, stated as follows:

> In this particular sequence of events starting back at the end of January, February, March, April, there were numerous examples where if there was an attorney present, the defendant made the assertion that he wanted to represent himself and proceed without counsel, which in each instance was denied.
>
> There were instances where he was represented by the public defender, and in each instance where the public defender asked – either that she wasn't prepared or hadn't received the discovery or some reason, the defendant continually asserted that he would represent himself to proceed, and that despite those representations, the Court would turn down or deny his permission to represent himself, and without proper advisement to the defendant would deny or continue the proceeding without the defendant's acknowledgement of what effect that may have on his speedy trial.

Jan. 27, 2006 Hr'g at 36.

On January 31, 2006, Applicant filed a letter addressed to Judge King requesting that he be able to represent himself.   Case No. 04CR706 Court File at 344.   He asserted that he had asked to represent himself many times and his right to self-representation

20

constantly had been denied in violation of his speedy trial rights.   *Id.*   Applicant further

stated that he had filed motions *pro se* since February 2005 and this issue needed to be

addressed.   *Id.*

On February 8, 2006, the trial court addressed the request of Applicant's third

attorney (Mr. Henry) for permission to withdraw as counsel for Mr. Vreeland.   Feb. 8,

2006 Hr'g Tr. at 3.   At issue in Mr. Henry's request to withdraw was a criminal report

prepared by the sheriff's office, reflecting Applicant's assertion that Mr. Henry had tried to

blackmail Applicant for the money that allegedly had been stolen by another of Mr.

Henry's clients.   *Id.* at 4.   According to Mr. Henry, Applicant denied the allegations and

told Mr. Henry he had to do what he had to do.   *Id.* at 5.   The prosecution then

addressed the issue as follows at the hearing:

> MR. VAHLE: Judge, I don't have a lot of argument as to whether or
> not he should be allowed to withdraw.   I want the record to be very clear,
> though, as to how this came about.

> Lieutenant McMahon is here.   If the Court wishes, I can either add to
> the offer of proof which counsel has put on the record, which I think is --
> what he stated is all true.   Or I can call Lieutenant McMahon to detail the
> circumstances.   But I think given the nature of the litigation in this case,
> there needs to be a very clear record of how this came about.

> THE COURT: If you wish to make an offer proof, you may.   I've
> heard from Mr. Henry; I don't dispute Mr. Henry's statements in any way,
> shape, or form with respect to what occurred.   He's indicated to the Court
> he has a conflict. I'm not even permitted to really inquire into the conflict.   If
> counsel indicates he's got one, then that's probably about all the further
> inquiry that I can make.

> MR. VAHLE: And, Judge, if I may make just a little more record.   I've
> talked to Lieutenant McMahon, and my understanding is about
> mid-December Mr. Vreeland approached him and wanted to level a
> complaint against Mr. Henry.   He did tell Lieutenant McMahon that Mr.
> Henry was trying to blackmail him.   He provided him some documentation,
> including some sort of power of attorney documents that were -- have Mr.

Henry's name and address on them allegedly prepared for the transfer of some moneys.

There was this statement, as Mr. Henry discussed, that Mr. Vreeland and Mr. Wanta, Leo Wanta, had been involved in some crime, had some access to a bank account, and how somehow Mr. Henry and Mr. Wanta were attempting to blackmail Mr. Vreeland.   He requested that Lieutenant McMahon have the FBI look into that.

Lieutenant McMahon did follow up on that request, did ask the FBI to investigate.   The FBI, after some discussions -- and I think there was some trouble getting ahold of him -- frankly refused to come and speak with Mr. Vreeland having spoken with him on numerous occasions about other matters and, frankly, finding him to be incredible said, "We don't even want to talk to him."   So there was no investigation I know of by the FBI.

That material was then turned over to Dea Aragon.   There was some discussion in earlier hearings about the timing of this material coming up.   I think that's important for future issues.

That material was turned over to Dea Aragon on the 12th of January. Dea Aragon had surgery and had her gallbladder removed on the 13th of January, returned to her office on the 25th of January, and reviewed that material for the first time on the 26th of January.   And it was provided to the district attorney's office on the 27th, and then provided that morning to counsel.

So that's all the record I want to lay. I don't have any position as to the issue.

Feb. 8, 2006 H'rg Tr. at 6-8.

Mr. Henry then confirmed his desire to withdraw after the prosecution made the above offer of proof.   *Id.* at 8.   The trial court asked Applicant if he wanted to have counsel represent him, to which Applicant responded, "No."   *Id.*   Applicant also responded "yes" to the court's question if he wanted to proceed *pro se* and stated that he wanted to "finish the motions today, please."   *Id.*   The Court then provided the *Arguello* advisement to Applicant as follows:

THE COURT: Mr. Vreeland, do you understand that you have the right to be represented by counsel throughout these proceedings?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that if you cannot afford an attorney, that one will be provided to you free of charge?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that I will appoint counsel if you want an attorney to represent you?

THE DEFENDANT: Yes, I do.

THE COURT: Previously you've been advised of the charges against you.   Do you recall the advisement of the charges that are currently pending against you?

THE DEFENDANT: Yes, I do.

THE COURT: And I believe there has been -- do you recall being advised of the potential punishment with respect to the charges that are pending against you?

THE DEFENDANT: Oh, yes, I do.

THE COURT: And there's been the addition of some habitual criminal counts. Have you been advised with respect to the potential consequences of the habitual criminal counts and the punishment with respect to that?

THE DEFENDANT: Yes, I do.

THE COURT: All right.   Do you have any formal legal training?

THE DEFENDANT: A little bit.

THE COURT: How much is a little bit?

THE DEFENDANT: I have 17 different certifications.

THE COURT: How far have you gone in school?

THE DEFENDANT: Bachelor's.

23

THE COURT: Are you under the influence of any drug, medication, or alcohol that would affect your ability to understand these proceedings?

THE DEFENDANT: No, I do not.

THE COURT: Do you wish to consult with the public defender before you make a decision to waive counsel and represent yourself?

THE DEFENDANT: Absolutely not.

THE COURT: Do you understand that the field of criminal law is complicated and that a lawyer trained in this field would be of great help in preparing and presenting your defense?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that you have a right to remain silent and that anything you say can be used against you in court?
THE DEFENDANT: Yes, I do.

THE COURT: Would you request that the court appoint counsel to advise you?

THE DEFENDANT: No.

THE COURT: While you should understand that you have a right to represent yourself, by doing so you take a great risk of not properly representing yourself and preparing your defense.   Do you understand that, Mr. Vreeland?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that you have a right to confront witnesses against you and to cross-examine them?

THE DEFENDANT: Yes, I do.

THE COURT: Do you understand that you have a right to have witnesses you choose compelled to appear in court and testify on your behalf?

THE DEFENDANT: Yes, I do.

THE COURT: Mr. Vreeland, what is your request at this point in time with respect to whether you wish to have the court appoint counsel to represent you?   You are clearly indigent, you're in custody.   Do you wish the court to appoint counsel to represent you?

THE DEFENDANT: No, I do not want appointed counsel.

THE COURT: Do you wish to represent yourself?

THE DEFENDANT: Yes, I do.

*Id.* at 10-12.

The trial court in response to a request by the prosecution further advised

Applicant as follows:

MR. VAHLE: Judge, the People are prepared.   I would ask for just a little further advisement under *Arguello* on a couple of issues, if I might.

THE COURT: Tell me what you want the court to ask, and I'll see if I will grant it.

MR. VAHLE: Judge, first off, the court has asked whether the defendant wants a public defender or wants to speak with a public defender.   There was a conflict on this case.   Originally Juliet Miner was appointed as alternative defense counsel.   I would just ask the court to ask Mr. Vreeland whether he wished to speak to Ms. Miner, his former counsel, or other alternative defense counsel.

THE COURT: Are you indicating that previously there was a conflict with the public defender's office?

MR. VAHLE: The public defender's office represented the codefendant, [J.O.], and therefore and could not represent Mr. Vreeland.

THE COURT: So what I'll do -- taking that into consideration -- what I'll do, Mr. Vreeland, I've just given you an advisement with respect to your desire to consult -- as part of that advisement, there was a question asked of you if you wish to conduct with the public defender.

In this case, obviously there's a conflict of interest.   If you wish to speak with Ms. Miner, I would certainly accord you that opportunity, as she represented you in the past.   And if you seek appointment of counsel, it

25

would be alternate defense counsel; it would not be the public defender's office.   Do you understand that?

THE DEFENDANT: I understand that, but there was a conflict with Juliet Miner as well.

THE COURT: Well, what I'm saying to you is, if you seek counsel, it would not be the public defender's office.

THE DEFENDANT: I understand that.

THE COURT: I would appoint someone else to represent you in this case.   I cannot tell right now whether it would be Ms. Miner or not, perhaps it wouldn't be.   But if you're asking me for counsel, it would not be the public defender.

THE DEFENDANT: I'm not asking for counsel.

MR. VAHLE: Judge, secondly, I would just ask the court to advise the defendant that while conducting the trial, he would be required to follow the same rules -- the standards, rules of evidence, all those things that happen in the trial as if he had counsel.   And then, further, have him state his desire to go forward.

And, lastly, Judge, I would ask the court to advise the defendant that the court would consider giving him time to hire his own attorney -- he has hired two private attorneys in this case -- and have at least a record as to his desire to hire private counsel as opposed to having counsel appointed for him.

THE COURT: What I think I'll do is make some further inquiry of you, Mr. Vreeland. I note that there have been two previous counsels in this case retained by you.   If you need and wish to retain counsel, I'll accord you the time, if that's what you're seeking at this point.

THE DEFENDANT: No, that's not what I'm seeking, your Honor.

THE COURT: All right. With respect to the other issues raised by Mr. Vahle, should you desire to represent yourself, obviously, that is perhaps an unwise decision on your part, but the same rules of conduct, the rules of evidence that apply to counsel will also apply to you.

THE DEFENDANT: I understand that.

THE COURT: And I think you've indicated to me before today you wish to proceed with the motions hearing; is that correct?

THE DEFENDANT: Yes, I've always wanted to proceed, yes.

*Id.* at 13-16.

Once the trial court found Applicant able to proceed *pro se,* the court directed Applicant to submit all motions.   On February 9, Applicant filed *pro* se fifteen documents that either were motions, notifications, or objections.   Case No. 04CR706 Court File at 000352-88.   A letter from Applicant to the prosecution also was docketed on February 9 regarding Mr. Henry's alleged dishonesty and his failure to inform Applicant about the prosecution's willingness to enter into plea negotiations.   *Id.* at 000390.   The trial court disposed of several of the motions prior to the February 16, 2006 hearing.   *Id.* at 000398-400.   On February 15, 2006, Mr. Henry, on behalf of Applicant, appealed the trial judge's denial of the various motions to recuse that had been filed.   *Id.* at 000402-428.

At the February 16, 2006 motions hearing, Applicant submitted at least five additional motions to be considered along with the other motions, objections, or notifications filed previously by Applicant.   *Id.* at 000429-45.   On February 17, 2006, Applicant filed an eight-page motion to reconsider the court's February 16 Order denying several of Applicant's motions prior to the hearing.   *Id.* at 448-55.   In the February 17 filing, Applicant asserts in part that he

> has been forced to go to trial *pro se* at the last days due to a conflict created by the state with his attorney.   The state has place [sic] the Defendant into the position that either he waives his speedy trial right and any right to review the evidence against him, and proceed to trial unprepared without the facts against him, or accept appointed counsel or retain counsel and waive his right to speedy trial.

*Id.* at 454.   Then, on February 21, 2006, the day before his jury trial was to start,

Applicant filed a motion for an immediate hearing to "discuss possible adjournment and

other pretrial issues."   *Id.* at 456.   The trial court held a hearing the afternoon of

February 21.   The court indicated it would enter an order addressing most of the issues,

but would address some narrow issues the morning of February 22 and delay *voir dire*

until the afternoon of February 22.   Feb. 21, 2006 Hr'g at 3.   The trial court further

announced that Applicant's appeal to the Colorado Supreme Court, through Mr. Henry, of

the denial of his motion for the trial judge to recuse, had been denied.   *Id.*   At the

February 21 hearing, the deputy district attorney, Mr. Vahle, informed the court that jail

staff had told him Applicant indicated his desire to have counsel.   *Id.* at 4.

During the February 22 hearing, Applicant submitted a motion for continuance to

seek advisory counsel to review all discovery material and stated he was waiving his

speedy trial right.   Feb. 22, 2006 Hr'g at 8.   Applicant further asserted that he did not

know that he had to specifically request a continuance or waive his right to a speedy trial

when there appeared to be a *Brady* issue.   *Id.* at 10.   After the court advised him that he

had a right to be tried within six months of the date he entered a not guilty plea and within

six months of the date he requests a continuance, Applicant stated he understood and

affirmed he wanted a continuance, but indicated that he did not need the full six months.

*Id.* at 14-15.

The colloquy between the court and Applicant regarding a continuance was as

follows:

> THE COURT: We will schedule the matter, but I have to first rule on
> the request to continue the trial.   It's your motion.

By doing this, you are agreeing to waive speedy trial for the next six months.   We'll set it in accord with the court's calendar when I bring my clerk out, but what you're agreeing to do is you're agreeing by requesting to continue the trial that speedy trial is waived for six months.   There's no four month, three month, two month, one month.   It's six months.   Do you understand all that?

THE DEFENDANT: Yes, I do.   If I have to waive to get this done, that's what I have to do, yes.

THE COURT: Is that what you want to do in this case?

THE DEFENDANT: Yes, I do.

*Id.* at 15-16.   The trial was reset for July 6, 2006, and all motions were to be filed no later than forty-five days from February 22, 2006 hearing.   *Id.* at 51-52.

Starting March 24 through April 20, 2006, Applicant filed *pro se* six motions or requests for (1) an extension of time to meet the forty-five day deadline for motions; (2) sealing items in discovery; (3) an order of no contact between witnesses and victims; (3) court assistance in entering a restraining order and complaint against district attorney; (4) a hearing date; and (5) all discovery and compliance with all court orders.   Case No. 04CR706 Court File at 000490-494, 000501-502, 000506-516, 000518-526.   On April 28, 2006, the trial court set a hearing for May 18, 2006 regarding the motions. Apr. 28, 2006 Hr'g at 2.   On April 27, 2006, Applicant signed and sent to the court eight additional motions, which were received on May 2, 2006.   Case No. 04CR706 Court File at 000569. In particular, in a motion for dismissal, Applicant stated that as early as November 3, 2005 he demanded to proceed *pro se* because he and his attorney were having conflict issues and his attorney had failed to file motions on October 3, 2005.   *Id.* at 000548.   Applicant further stated that he had informed his attorney he wanted to proceed *pro se* and have his attorney serve as advisory counsel.   *Id.*   Applicant also submitted eight subpoenas for

29

appearances at the May 18, 2006 hearing and a witness list.   Case No. 04CR706 Court

File at 000530-539.

On May 17, 2006, the trial court denied many of the motions.   Several motions

were discussed during the May 18, 2006 hearing, some were ruled on, and others were

left open.   May 18, 2006 Hr'g.   On June 8, 2006, Applicant filed a motion for

continuance, a request for hearing, a request for production of *Brady* materials, and a

motion for a new preliminary hearing.     Case No. 04CR706 at 000650 and 661.

Applicant further submitted a letter on June 8, 2006 to the trial court that stated he had

retained the services of the law firm Buchanan, Jurdem, and Cederberg, specifically Scott

Jurdem, to assist him with the motions.   *Id.* at 000654.   A hearing was held on June 16,

2006 to address the June 8 motion for continuance.   June 16, 2006 Hr'g at 2.   During

the hearing, the trial court recapped the procedural events of the case since February 3,

2005, and noted that when Mr. Henry withdrew, and since then, Applicant stated his

desire to represent himself.   *Id.* at 9-11.   The trial court further noted that even at the

June 16 hearing Applicant stated that he was retaining advisory counsel and not counsel

to represent him.   *Id.* at 11.   The trial court set a hearing on June 27, 2006 to address

the remaining motions.   *Id.* at 13.

On June 27, 2006, attorney Joseph Scheideler entered an appearance on behalf

of Applicant and appeared at the June 27 hearing.   Case No. 04CR706 Court File at

000903; June 27, 2006 Hr'g at 2.   At the beginning of the hearing, Mr. Scheideler asked

the trial court if Applicant could act as his own counsel and Mr. Scheideler as advisory

counsel at the hearing.   *Id.*   Mr. Scheideler also asked that the trial be continued so he

could prepare.   *Id.* at 3.   He further stated that Applicant would waive his speedy trial

rights until the end of August and that he would like to try the case and to be advisory

counsel on the case.   *Id.* at 7.   The trial court informed Mr. Scheideler that because he

entered an appearance in the case he is counsel of record and not advisory counsel.   *Id.*

at 9.   The trial court also stated as follows:

> THE COURT: I won't old [sic] it against you that you have a past
> history from New York.   But what I will tell you this, you have entered you
> [sic] appearance in this case, so you are not advisory counsel, you are
> counsel of record.   If you were advisory counsel, the matter would proceed
> to trial on the 6th of July.   The concern the court has is that there is a
> manipulative aspect of this that is very obvious to the court.   And I do not
> want to be played by anybody.   And the concern I have is that I agree it
> would be impossible for you to be prepared to try this case by July 6th.
>
> The People's arguments are well taken.   This is not the first time we
> have been placed in this posture and it has not been something that has
> been generated as a result of what the prosecution or the Court has done.
> The past history of this case, as articulated by Mr. Vahle, speaks to the
> issue of there being an attempt to avoid the ultimate resolution of this case
> before a jury.
>
> Having said all that, I believe the court will be setting up error in this
> matter for the matter not to be permitted to proceed with competent and
> effective counsel.   And the court finds there is an entry of appearance in
> this matter.   The court has accepted that entry of appearance Mr.
> Scheideler is not advisory counsel.   He is Mr. Vreeland's lawyer based
> upon that entry of appearance.   Based upon that, the court first of all find
> [sic] with respect to the motion today Mr. Vreeland is not counsel at this
> Point [sic] time Mr. Scheideler will not be proceeding on pro se motion.
>
> I will allow you the opportunity to review those motions and tell me
> which ones, if any of them, you believe have merit and I will certainly let you
> address them to the court at some point later.   We are not having Mr.
> Vreeland act as his lawyer you're the attorney.   With respect to the [sic]
> that it's with some reluctance that the court finds it would be appropriate to
> grant the request to continue the trial, request the matter be set in August is
> problematic we will set it along the court's calender [sic]and counsel's
> calendar.   The court finds that the request by defense to have the matter
> continue Mr. Scheideler with your permission I will speak to your client with
> respect to speedy trial issues.
>
> MR. SCHEIDELER: Yes.

31

>    THE COURT: Mr. Vreeland, by asking for a continuance you are agreeing that the People have six months from today's day in order to bring you to trial, do you understand that?
>
>    MR. VREELAND: Yes, sir.
>
>    THE COURT: Is that what you wish to do?
>
>    MR. VREELAND: Yes, I do.

*Id.* at 9-10.   A hearing was set for September 1, 2006, to address any remaining motions. *Id.* at 13.

Subsequently, the trial court entered an order setting the trial for November 28, 2006 and establishing a deadline for the entry of pleas by November 27, 2006.   Case No. 04CR706 Court File at 000906.   On August 14, 2006, Mr. Scheideler withdrew several pending motions.   *Id.* at 911.   At a hearing on September 1, several motions were addressed and a follow-up hearing was set for October 13, 2006.   Sept. 1, 2006 Hr'g at 19.

Mr. Scheideler filed a motion for new preliminary hearing on October 6, 2006, Case No. 04CR706 Court File at 000929, and a motion to reconsider the motion to dismiss all counts, *id.* at 000914.   At the October 13, 2006 hearing, the trial court denied both motions and granted Mr. Scheideler's request for a second hearing to address any issues with the transcripts and any concerns that his conversations with Applicant were being listened to by jail staff.   Oct. 13, 2006 Hr'g at 8 and 12.   The trial court set a hearing for November 3, 2006.   *Id.* at 16.   The trial court instructed that this would be the final motions hearing and that all challenges regarding transcripts would be presented in writing in advance of the hearing.   *Id.* at 13.

On October 30, 2006, Mr. Scheideler submitted several motions to the court: (1)
motion for dismissal of all counts based on fabricated evidence and misrepresentations
by investigator Dea Aragon; (2) motion for veracity hearing and suppression of search
warrant and all alleged evidences and or statement made to law enforcement as a direct
result of the illegal search and seizure; (3) motion for hearing and ruling on the dismissal
of habitual charges prior to trial; and (4) motion for hearing and suppression of all Rule
404(b) testimony and or evidences.   Case No. 04CR706 Court File at 000930-31,
945-46, 948-49, 952-53.   Mr. Scheideler also submitted a Rule 16 disclosure of
witnesses and defenses on October 20, 2006.   *Id.* at 000947.   The trial court denied all
motions at the November 3, 2006 hearing.   The court also denied Applicant's request for
a continuance of the trial date so his computer expert could evaluate the hard drives of the
three computers seized from Applicant's home.   Nov. 3, 2006 Hearing at 21.   The trial
court found the motion for a continuance lacked good faith, but it allowed Mr. Scheideler
to file one motion regarding the hard drive within five days and allowed the prosecution to
respond to the motion within five days from the filing of Mr. Scheideler's motion.   *Id.* at
22-23.

On November 7, 2006, Mr. Scheideler filed a motion to submit a transcript record
regarding the provision of the hard drives and a motion to withdraw, along with Applicant's
motion for a continuance.   Case No. 04CR706 Court File at 000954, 960.   A hearing
took place on November 17, 2006 to address the motions.   Nov. 27, 2006 Hr'g.   At the
November 17 hearing, Mr. Scheideler stated that Applicant had fired him because they
had "grave disagreements as to the methodology that would be used here, and besides
that, there is a lot of personal animosity at this point in time."   Nov. 17, 2006 Hr'g at 13.

33

Mr. Scheideler further stated that "there is a true conflict of interest, both a grievance and a -- lawsuit pending regarding -- regarding this." *Id.*

In response to Mr. Scheideler's statements, the trial court told Mr. Scheideler that (1) he needed to provide "more of a record" with respect to the withdrawal; (2) no formal complaint had been filed with regulation counsel; and (3) a mere disagreement with his client is not adequate grounds for the court to grant a request to withdraw. *Id.* at 14-15. At the trial court's request, Mr. Scheideler proceeded to describe the conflict as follows:

> MR. SCHEIDELER: Well, in the beginning of this case, I reviewed thousands of pages of -- of discovery material, had intense contact by telephone and in person, and associates of my firm also in person, with Mr. Vreeland regarding both federal writs and motions, and in the course of doing so, became very familiar with the facts of the case.

> I have viewed all of the videotapes, and my method of trying the case would involve a great deal of defense work regarding cross-examining the witnesses.   Mr. Vreeland does not agree that that is the method of choice; that although he would agree with that particular method, his -- he would prefer to call numerous witnesses, some of whom I can't agree are -- are cogent or necessary for the -- for the case.

> As a result of these disagreements, he has considered that I am incompetent and, therefore, not -- and -- and also that I'm in league with either the court or the District Attorney's office and, therefore, I have a conflict of interest in his mind regarding -- regarding the case.

> Again, I have -- I have reviewed the case to the extent where I am prepared to try the case.   Our disagreements go very deep at this point in time.   We have had a number of rather harsh exchanges between one another and he no longer trusts me, number one; and number two, he believes that I am incompetent.

> I have notice that I am, you know, going to be in -- in a lawsuit with him, which further drives a wedge between our cooperation.   I -- I have no longer any communication with him; and in this particular case, communication is absolutely essential in order to -- in order to try the case properly.

THE COURT: Mr. Scheideler, with respect to the two issues -- other two issues with respect to this lawsuit and the allegations of the grievance, can you speak to those so –

MR. SCHEIDELER: Well --

THE COURT: -- that I have a better understanding of that?

MR. SCHEIDELER: -- I've -- I've been notified by him that I'm going to receive a lawsuit, and I have no doubt that that's going to occur, because he has already sued everyone else, including Mr. Vahle and yourself.   So I have no -- no doubt that he's going to go ahead with that.

He has filed his own motions.   He has reviewed all sorts of law and knows the procedure for filing lawsuits and grievances.   So I have to take him at his word.   Aside from our disagreements, he has never said that he was going to do something that he didn't do.

THE COURT: All right.   Anything else, Mr. Scheideler?

MR. SCHEIDELER: No, Your Honor.

THE COURT: All right.   The Court has entered numerous orders in this case.   The case has been continued several times, usually on the eve of trial.   The court finds there is no good faith basis in support of the request to continue.   The motion to continue is denied.

*Id.* at 15-17.

The trial court then allowed Applicant to present his position.   Applicant stated

as follows:

THE DEFENDANT: Your Honor, I've just sit here and listened to what Mr. Scheideler has said, and I did write you that letter -- and my back's been hurt really bad, so I'm leaning over, so I'm sorry.

I said inside the letter to you that I would waive the attorney/client privilege with the recorded telephone calls between me and Mr. Scheideler if he'd ever start lying to you.   Well, I'm willing to do that now, because he knows that he quit on me.

The reason there's no communication is because he won't take my calls.   He told me, F. off, don't call me.   Sue me.   He did that in October.

35

I did everything in my power to get this man to get online and to defend me. I gave him a witness list of 80 people; he hasn't spoken to anyone.

And all this is on the telephone and he's sitting here smiling acting like it's no big deal.   The things he said about the court, the things he said about Darren Vahle, all of that is on tape and I'm willing to waive the attorney/client privilege.

The problem here wasn't me.   I've tried everything that I can to get him to do what he's supposed to do.   Name one thing that he said he was going to do that he's ever done.

He has this sheet here, talk about he's all ready for trial, the things that he just mentioned to you.   In here he talks about how many videotapes he's – he's reviewed.   He started reviewing the videotapes of the witnesses a week ago, and he's only went through maybe three of them, and there's 13 two-hour videotapes that he hasn't reviewed.

He hasn't reviewed any of the witness statements.   He hasn't reviewed any of the witnesses that I've given him.   He hasn't spoken to either of the private investigators that I've hired.   He's taken almost $26,000 from my family.   He told us he was going to hire a private investigator.

He was going to hire a computer expert, which finally he just did hire a computer expert.   I sent him money to pay the computer expert by a credit card.   He gave the computer expert 500 bucks, didn't even give him all the money that my mother gave him.

And as far as lawsuits goes, my parents are suing him in U. S. District Court in the District of Michigan.   They've retained new counsel. They are suing you.

That's what's going on with the lawsuit.   He's misappropriated the funds.   He hasn't done anything in this case.   He's sitting in this court and he's trying to make it look like I'm trying to accuse him of being in cahoots with this court or Darren Vahle, and that's shit, that's fantasy.   I never said no such thing.

And if the court or Darren Vahle wants to review those tape-recorded conversations of me and Mr. Scheideler when he says the things he says about this court and about Darren Vahle and about Dea Aragon or anybody else, you're more than welcome to listen to them.

36

We had a verbal agreement and a written agreement on this case. He's done nothing.   Now that we're inside the courtroom, he's trying to make it look like he's Mr. Innocent.

I have mailed out the complaint against him with the attorney regulation's counsel.   I sent the letter to Mr. -- I think it's Fat -- Fatzinger or Fitzinger (phonetic/sic), something like that.   I just got a response from him on a different grievance that I filed against Mr. Vahle.

He does release attorney/client information.   He's – he's been doing it himself.   He's been talking to people about my case, about things that I've said to him, things that have not been made public.   Like he just brought up the fact about this lawsuit that I've sued Darren Vahle.   I don't know if anybody's been served on that, because federal court ordered us not to tell anybody we were suing him.   So I don't understand why he's in the courtroom now telling people that we're suing Darren Vahle.

There's no way that this man can represent me.   That's why I tried in October to correct this.   And I was really specific on the phone, because I know that they record the telephone calls, so I was really specific with it.   I asked him specific questions.

When he came down to the jail finally after it was 11 weeks of waiting for him to come down, he was here and he told me that his wife would divorce him, and his associate's girlfriend would leave him if they didn't leave right away, so we still couldn't discuss trial strategy.   I have never with this man discussed trial strategy, and that's what the arguments have been about all the time.   We've never discussed witnesses, we've never discussed theory of the case.   We've never discussed anything on this case.

He said he was going to do a lot of things, he never did them, and then finally he quit.   He said, F. you, F. you, I quit, sue me.   I said, Well, then give me my money back.   That's when he said, F. you, and he hung up and he quit.   Jesse Glassman was present when he did it, it's recorded on the telephone call, and I'm willing to waive the conversations.

That's pretty much all I have to say, Judge.

*Id.* at 17-21.

The trial court allowed Mr. Scheideler to respond, which he did as follows:

MR. SCHEIDELER: Your Honor, I don't see, considering the statements that we just heard, that I can possibly proceed on this case.

Obviously, if you were to order me to do so, I would do so; but without the communication, without the trust, and with the – with the wedge that's being driven between us legally, counsel has advised me that I must -- I must redound to that request to withdraw.

As far as the -- the ineffective assistance of counsel argument, I have my detailed hourly work noted from the day I started this case.   Despite the fact that it was a flat fee for -- for preparation and a flat fee for trial, I've received almost the entire flat fee for the preparation, not the entire part.   I have not received $26,000.

I have given the computer expert the entire $1200 that was given to me by his mother through credit card to -- to continue the case.   I'm informed by that expert that he's spent 15.5 hours and that there's due and owing $350 more.

I've met with Tom Kerwin (phonetic), who is the alleged investigator in this case on two separate occasions, and the fact that the -- the -- the statement that I have not reviewed the witnesses' statements or have not viewed the videotapes is -- is false.   It's not true.

*Id.* at 22-23.

Applicant then told the trial court that he did not want Mr. Scheideler to represent

him.   *Id.* at 24.   The trial court found as follows:

THE COURT: All right.   Having heard this, having heard from counsel, and Mr. Vahle is right to a certain extent, he doesn't have a dog in this fight, except for the fact that the trial has been continued on more than one occasion, and that's where this at least is being postured at this point in time if Mr. Scheideler withdraws here on the eve of trial.

The court does have concerns about the 11th-hour nature of this, but the court has also listened to Mr. Scheideler, has listened to Mr. Vreeland. It appears to the court it's obvious from the purpose -- from the record that there does exist a conflict between the two with respect to how the case is to proceed given the nature of Mr. Vreeland's own statements today and the letter that was written indicating that he intended to sue and to grieve Mr. Scheideler.

Given the fact that while there is no grievance that the Court is aware of that's been filed yet, it would seem to the Court that if a client has indicated that his intentions were to grieve and to sue his counsel, that

would certainly serve as grounds to put a chill on the relationship between attorney and client and could very well impact or affect the ability of counsel to be effective.

Obviously, Mr. Scheideler would have to conduct the trial certainly in a professional manner, but obviously knowing that even before he started that the case was going to be subject to -- he was going to be subject to a potential grievance and a lawsuit, that would not be a cloud upon which -- under which someone should be trying a case.

While I understand this, I have some reluctance given the 11th-hour nature of this, but I'm only dealing with the motion to withdraw at this point in time, and I think that the record's been complete with this and the court believes that Mr. Scheideler's motion does have merit given what I've heard today, and I will permit Mr. Scheideler to withdraw as counsel in this case. I do this reluctantly, not casting any particular aspersion on anybody, just we find ourselves in a very awkward posture at this point in time.

Now having said that, I intend to address the motion to continue, which I believe now that Mr. Scheideler is no longer counsel, would be Mr. Vreeland's.

*Id.* at 24-26.

Applicant stated that he had contacted Al Haddon's Office and attorney Pamela Mackey.   Applicant said that they were waiting to hear from him regarding appointment, but they could not be prepared to proceed to trial in ten days.   *Id.* at 28.   Applicant further stated that he did not want a six-month continuance and he could not proceed to trial by himself.   *Id.* at 28 and 35.   The trial court then read the results from a mental status examination performed by Dr. Chamberlin as part of the competency evaluation the court ordered at the request of Mr. Henry.   After reading the results of the examination, the trial court found as follows:

THE COURT: . . .With respect to a diagnostic formulation, Mr. -- or Dr. Chamberlin indicated that Mr. Vreeland's intelligence level is high average minimally and he has a distinctly acute understanding of the proceedings against him and his ability to work with his attorney to develop the best defense possible is not an issue.

With respect to that, the court clearly notes for the purposes of this record that Mr. -- Mr. Vreeland, as articulated by Dr. Chamberlin in the report, has a tendency -- first of all, is highly intelligent, understands the criminal justice system very well, and is, as Dr. Chamberlin noted, will "use the means available to him in the moment to accomplish his goals, including threatening suicide, threatening litigation, and intimidating those around him."

The court harkens back to the first appearance of Mr. Vreeland before the court in which Mr. Vreeland described the court and said the following after the court had entered an order:   "So you will not let me contact my counsel?   Okay.   No problem.   Piece of shit.   Mother fucker piece of shit."   Clearly, an attempt by Mr. Vreeland to intimidate the court.

The court also notes the following: Mr. Vreeland had a long history of contacts with previous counsel in this case.   I'm going to spend a moment of time to go through that history in some detail.

Mr. Vreeland, on January 28th, indicated – one of his earlier appearances on January 28th, 2005, indicated that he had retained private counsel, he did not wish to have the public defender appointed to represent him.   On February 23d, the court appointed the alternate defense counsel to represent the defendant because of an obvious conflict with the public defender's office.   No lawyer had appeared on behalf of Mr. Vreeland.

Mr. Vreeland made requests as early as the 17th of February, 2005, to have the alternate defense counsel withdraw, and on the -- court indicated that alternate defense counsel would remain on the case until the defendant had retained other counsel.   On the 24th, the preliminary hearing that was set for that date was continued at the request of all parties based upon Mr. Vreeland's representations that he was retaining private counsel and that alternate defense counsel would not be proceeding.

On the 10th of March, a lawyer named Tucker, who I believe is associated with Mr. Steinberg's office, Steinberg and -- pardon me, Springer and Steinberg -- appeared and the matter was set for preliminary hearing on the 12th of May, 2005.   On the 12th of May, the defendant again moved to continue the preliminary hearing, that was denied.   The preliminary hearing was held on the 12th of May.   On the 19th of May, a county court judge made findings and bound the case over to district court.

Mr. Vreeland appeared in district court on the 31st of May, 2005, with Mr. Steinberg.   The arraignment was set for July the 6th.   Mr. Steinberg

appeared, Mr. Vreeland also appeared, on July the 6th, 2005.   The matter was then set for trial with a motions hearing being set.

On the 13th of September, Mr. Steinberg filed a motion to withdraw. Mr. Vreeland indicated that a gentleman named Mr. Young would be entering his appearance on behalf of the defendant.   Mr. Vreeland provided a phone number for Mr. Young.

On the 22d of September, 2005, a Thomas Henry appeared on behalf of the defendant.   The matter was set over for further proceedings to the 30th of September.   On the 3d of November -- and trial in this case had been set for December the 6th.   On the 3d of November, the defendant refused to appear in court.   His -- the issue of competency was raised by Mr. Henry.   The court then directed that in accord with the statutes that an examination be conducted, I just read from portions of that examination that eventually occurred, and the trial date was then vacated due to the defense counsel raising the issue of competency.

On January, 2006 -- January 6th, 2006, the court found, based upon Dr. Chamberlin's report, that the defendant was competent.   Jury trial was reset within speedy trial.   On the 1st of February, counsel for Mr. Vreeland, Mr. Henry, raised the issue of a potential conflict, which included the defendant accusing Mr. Henry of blackmailing him.

On the 8th of February, Mr. Henry reasserted that conflict.   The court, having heard that and also having heard that that was Mr. Vreeland's desire, to have Mr. Henry withdraw, granted that request.   Mr. Vreeland requested to represent himself.   The court conducted several *Arguello* advisements and went into detail.   Mr. Vreeland adamantly asserted his right to represent himself.

On the 22d of February, in spite of the defendant having previously indicated he had no desire to continue the trial, the defendant asked to have the trial continued.   The court granted that request, directed that trial be set for July the 6th of 2006.   The defendant made another request to continue that trial on June 16th, 2006.   That was denied.

On the 27th of June, the court permitted Mr. Scheideler to enter his appearance.   The court notes, and as the court has indicated previously, Mr. Scheideler indicated he would be unable to try the case on July 6th, the trial date, but he would be able to go later on, and at that time he was only asking the court for a short continuance.   He indicated to the court that he would be not able to try the case on the 26th (sic); there was no way on God's green earth that he could be competent and ready to proceed on July the 6th.

41

The court then permitted the trial to be reset, over the objection of the defendant -- over the objection -- over the objection of the People, to November the 28th.   The court notes that Mr. Scheideler represented the defendant, motions were litigated by Mr. Scheideler between the -- his entry of appearance and the day of trial, and on the 17th of November, today's date, 2006, the court permitted the defendant to withdraw -- pardon me, Mr. Scheideler to withdraw from representing the defendant.

What's clear to the court is that the pattern in this case is quite stark and is quite clear: Mr. Vreeland, while having the ability to certainly retain counsel, retains counsel, inescapably enters into a conflict, fires that lawyer, and has to seek to retain new counsel; it's occurred with -- it occurred with Mr. Steinberg, it occurred with Mr. Henry, and it lastly occurred with Mr. Scheideler.

With -- with respect to Mr. Henry and Mr. Scheideler, the court is aware that Mr. Vreeland made allegations that the -- that counsel were behaving improperly; either incompetently, as Mr. Scheideler articulated, or the issue of blackmail, as Mr. Henry articulated.

It's absolutely, positively clear to the court that Mr. Vreeland has the ability, as Dr. Chamberlin indicated, to dominate and control to seek to try and, if you would in a very simple term, get his way no matter what the cost, and he clearly has a working knowledge of the criminal justice system.

In this case, this case has been continued on more than one occasion.   The preliminary hearing originally set for the 24th of February, 2005, was continued.   There was a request to continue the May 12th, 2005, preliminary hearing that was denied.

The first trial was set on July the 6th, 200 -- pardon me, on July the 6th, the trial was set for December the 6th of 2005.   The defendant -- his lawyer raised the question of competency.   That then tolled that trial date and the trial date was reset by the court when the court found the defendant competent on July the 6th.   The trial date was reset for February the 22d. On the day of trial, the trial was continued at the request of the defendant based upon his representations to the court that he would be unprepared.

A trial date was set for July the 6th.   On the 16th of July (sic), the defendant, in a pro se fashion, asked to continue the trial.   This court denied that request.   But on the 27th of June, the court permitted Mr. Henry to enter his appearance.   The court permitted Mr. Henry -- pardon me, Mr. Vreeland -- pardon me, Mr. Scheideler to enter his appearance on June 27th, 2006.

On June 27th, 2006, over the objection of the People, the court granted Mr. Scheideler's request to continue the trial after his appearance was entered and trial was then set for the 28th of November.

The court also wants to mention briefly some of the prior motions filed by the defendant; and the court harkens back, once again, to Dr. Chamberlin's statements about Mr. Vreeland using any means available to him in the moment to accomplish his goals, including threatening suicide, threatening litigation, and intimidating those around him.

Mr. Vreeland, through counsel, filed, I believe, three or four motions to recuse this court.   Those motions were utterly without merit.   There was absolutely no substance to any of those.   Mr. Vreeland has also filed in a *pro se* fashion other motions that are completely devoid of merit.   He filed a motion to recuse the District Attorney's Office or disqualify them.   He has responded to court orders in an argumentative fashion.

He has asked in some fashion for a trial to the court after asking this court on four separate occasions to either grant a request to recuse or to reconsider the court's -- the court's previous denial of the request to recuse.

Mr. Vreeland, when he was pro se, was adamant, adamant in his desire to represent himself.   It starts with Dr. -- at least it's documented with respect to Mr. Vreeland in an interview with Mr. -- Dr. -- Dr. Chamberlin in which he indicated that his desire was to represent himself with Mr. Henry acting as a consultant.

The defendant's own *pro se* pleadings reflect a persistent, adamant desire to represent himself.   In a pleading or a motion encapsuled -- or -- or pardon me, entitled "Motion to Re-File and Argue" Positions -- pardon me – "Argue Portions of Previously Filed Motions As Well As New Motions Never Filed Before" filed on February 9th, the defendant indicated that he had "requested to represent himself in *pro se* form for at least 12 months, all on the record as recent as January 23d, 2006."

In a motion entitled "Motion to Send Back to Lower Court For the Purpose of Challenging Probable Cause Based on Full Disclosure and For New Preliminary Exam," the defendant indicated on January 28th, 2005, the defendant made a request to represent himself in the case.   That was denied, according to the defendant, and the defendant had alternate defense counsel forced upon him.   The defendant was left with no alternative but to accept this counsel as he was, in fact, denied his right to contact his retained counsel and/or family as required by law.

The defendant went on to mention at paragraph 15 of this particular motion that in every stage of the court's proceedings, this defendant mentioned that he wanted to contact his privately-retained attorney or represent his self.   Each and every time this request was mentioned, it was ignored.

Paragraph 17, defendant maintains and swears to the fact that the only reason he ever retained Mr. Steinberg -- Steinberg was because he was not allowed to contact his own-retained counsel, nor represent himself.

At paragraph 23 (sic), the defendant stated, (as read) "This defendant maintains that had this court or Judge Marker" -- let me just -- when he says "this court," he's referring to this court here, Division 1 -- "or Judge Marker's court allowed this Defendant to proceed *pro se* from the onset, we would not be where we are today.   Now that we have taken 15 months to get this court to give the Defendant a chance to defend himself, this Defendant requests that he be allowed to defend himself on all matters anew from the preliminary hearing aspect to the trial, if it gets that far."

The defendant has in the past had three privately-retained counsel represent him that this court is aware of.   If Mr. O'Donnell appeared at an earlier time, his name is not reflected on the minutes.   It's equally clear that each of those retained counsel have filed motions to withdraw based upon their inability to work with Mr. Vreeland, and at least with respect to two of them, based upon Mr. Vreeland either threatening them or accusing them of being incompetent.

Mr. Vreeland now tells the Court that he has contacted the firm of Haddon, Morgan & Foreman to represent him.   Given his history in this case, any lawyer, any lawyer would be wise certainly to keep in mind their own desire to be free of a grievance or a lawsuit.

As the court cannot tell whether the law firm of Haddon, Morgan & Foreman will enter their appearance, this court's certainly not precluding them from doing so, but the record reflects quite clearly they have not done so as of today's date.

What the court will find is that the defendant is, in fact, highly intelligent.   He has a very good understanding of the criminal justice system and this process.   This has been reinforced by counsel having to withdraw in previous circumstances.   Mr. Vreeland knows exactly what it takes to have counsel withdraw from a case; complain about them, intimidate them in some way, or allege that you are going to be filing a lawsuit or a grievance.

Mr. Vreeland, as noted by Dr. Chamberlin, has an extremely high interest in exercising control, manipulating and dominating.   He has obviously manifested a desire to represent himself in the past.   This court has conducted extensive *Arguello* advisements of the defendant at the time in which he insisted, after being advised of -- fully of his rights with respect to Arguello, that his desire was to represent himself.

The court notes in this case that this matter is a 2004 case that has not yet been brought to trial.   I've articulated the prior continuances in this matter.   I'm also mindful of the language in 18-3-411(4) in which our legislature has mandated that cases of this nature be given a preference for the -- with respect to them proceeding efficiently through the court system.

Certainly, while Mr. Vreeland has a right to a trial in this case, at this point in time, given the past machinations of this case, there also are other rights involved.   There are rights of the alleged victim to have this matter resolved in a timely fashion.   There are rights of the People, as articulated by 18-3-411, to have this matter brought to trial in an efficient fashion. There's also an obligation the court system has to do so.

Mr. Vreeland has attempted to create the perfect storm, if you would, from the standpoint of continually obtaining counsel and then firing them on the eve of trial.   This court finds that there is no good grounds for this court to continue the trial in this matter.   The defendant's request to continue the trial is denied.

Should the law firm of Haddon, Morgan & Foreman enter their appearance, I will obviously consider any motions they may file, but this matter is set for trial on the 28th of November.   It is the court's intention to bring this matter to conclusion on that date.

*Id.* at 43-55.   The Court notes that at the end of the November 17, 2006 hearing, when Applicant asked if he could ask a question and the trial court responded that the "Court is in recess," Applicant responded, "Okay, [p]iece of shit."   *Id.* at 55.

On November 21, 2006, Scott Jurdem, of Buchanan, Jurdem & Cederberg, filed a notice of conditional appearance based on a continuance being granted and financial arrangements with Applicant's mother for payment being complete by December 1, 2006. Case No. 04CR706 Court File at 000970-71.   The trial court entered an order addressing

45

the conditional appearance and found that the conditional entry of appearance was not an entry of appearance, and was "just another example of the [Applicant's] efforts to manipulate and control these proceedings." *Id.* at 000973-75.   The trial court also found that, if Mr. Jurdem entered his appearance unconditionally and with full knowledge that the trial was scheduled to commence on November 28, 2006, he then could address the court on behalf of Applicant; otherwise Mr. Jurdem was not counsel of record and the entry of appearance would not be considered.   *Id.* at 000974-75.

Mr. Jurdem then filed a second entry of appearance and request for a continuance of trial, *id.* at 000977-978, and appeared on November 28, 2006, the first day of trial. Nov. 28, 2006 Trial Tr. at 3 (Docket No. 72-1 at 3).   The trial court denied the request for a continuance and instructed Mr. Jurdem that it would permit him to conduct jury selection on November 28, and then would recess the trial after jury selection until the morning of November 30, when the court would proceed with the evidence.   *Id.* at 19-20.   The trial court determined the day and a half that Mr. Jurdem was being given to familiarize himself with the case was appropriate given the history of the case.   *Id.* at 20-21.   Mr. Jurdem responded that he could not prepare for trial in a day and a half and he would not enter an appearance.   *Id.* at 24.   The trial court then found Mr. Jurdem's statement a conditional entry of appearance, found no entry had been made, and told Mr. Jurdem he was excused.   *Id.* at 28-30.

On November 28, Applicant filed a motion *in limine* that, among other things, stated that he did not waive his right to counsel and demanded that his right to counsel be recognized.   *Id.* at 000980.

Once Mr. Jurdem was excused, the trial court proceeded to address pretrial issues and the jury selection process.   Nov. 28, 2006 Trial Tr. at 30-84 (Docket No. 72-1 at 30-84).   During this time, Applicant continued to argue that he was unable to proceed *pro se* and wanted representation during his trial.   *Id.* at 48-77.   He stated that he did not understand the *voir dire* process, but, once the court provided an explanation, Applicant participated in asking the court questions and providing answers, even though he continued to state he did not want to proceed to trial without counsel.   *Id.* 72-85.   Also, at the beginning of *voir dire*, Applicant told the jury that "I'm representing myself because the Court refused to let me have counsel or call witnesses."   *Id.* at 87.   The trial court ordered Applicant's remark stricken.   *Id.*

Applicant refused to participate in *voir dire* and stated that he was being forced to proceed by himself.   *Id.* at 205.   He further stated he wanted an attorney to "do this" and "I'm not going to ask any questions."   *Id.*   The court noted that Applicant had waived his right at that point to ask any questions of the jurors.   *Id.*   Nonetheless, Applicant participated in peremptory challenges and accepted the jury.   *Id.* at 205-09.   After Applicant argued discovery issues and the court returned from a recess to begin opening statements, Mr. Jurdem appeared to request that he be allowed to appear as advisory counsel for Applicant.   The court agreed with the understanding that the trial schedule would not be delayed and Mr. Jurdem would not be allowed to ask questions or conduct direct or cross-examination.   *Id.* at 250-256.   Mr. Jurdem continued as advisory counsel for the remainder of the trial.

In *Faretta v. California*, 422 U.S. 806, 807 (1975), the United States Supreme Court held that the Sixth Amendment affords a criminal defendant the right to proceed

without counsel.   *See United States v. Loya-Rodriguez, a.k.a. Protillo-Loya*, 672 F.3d 849 (10th Cir. 2012).   The Supreme Court also acknowledged that the right "cut[s] against the grain of [the] Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to assistance of counsel."   *Faretta*, 422 U.S. at 832.   The Court further recognized that self-representation is usually inferior to representation by an attorney and cautioned courts to ensure that the choice of proceeding without counsel is made "knowingly and intelligently" and only after a defendant is "made aware of the dangers and disadvantages of self-representation."   *Id.* at 834-35.

If a court "incorrectly determines that a defendant has elected self-representation, it has deprived him of the constitutional right to be represented by counsel.   But if it incorrectly determines that the defendant has not elected self-representation, it has likewise deprived him of a constitutional right."   *United States v. Miles*, 572 F.3d 832, 836 (10th Cir. 2009).   "[I]f a defendant in a criminal proceeding makes an equivocal demand on the question of self-representation, he has a potential ground for appellate reversal no matter how the district court rules."   *United States v. Treff*, 924 F.2d 975, 979 (10th Cir. 1991).

A defendant can represent himself only after four conditions are met:

> First, the defendant must clearly and unequivocally inform the district court of his intention to represent himself.   Second, the request must be timely and not for the purpose of delay.   Third, the court must conduct a comprehensive formal inquiry to ensure that the defendant's waiver of the right to counsel is knowingly and intelligently made.   Finally, the defendant must be able and willing to abide by rules of procedure and courtroom protocol.

48

*Loya- Rodriguez*, 672 F.3d at 856 (citing *United States v. Tucker*, 451 F.3d 1176, 1180

(10th Cir. 2006)) (citations and internal quotation marks omitted).   The right to

self-representation is not absolute.   *United States v. Akers*, 215 F.3d 1089, 1097 (10th

Cir. 2000).   A court is not obliged to accept every defendant's invocation of the right to

self-representation and may terminate the right to self-representation even after the right

is unequivocally asserted.   *Munkus v. Furlong*, 170 F.3d 980, 984 (10th Cir. 1999)

(citations omitted).

Applicant clearly and unequivocally informed the district court on more than one

occasion of his intention to represent himself.   On January 31, 2006, he wrote a letter to

the trial court stating he wanted to represent himself.   Case No. 04CR706 Court File at

344.   At the February 8, 2006 hearing, Applicant told the trial court that he did not want

counsel to represent him and he wanted to proceed *pro se*.   Feb. 8, 2006 Hr'g Tr. at 8.

During the *Arguello* advisement that followed, the court asked Applicant if he

understood he had the right to be represented by counsel to which Applicant responded

that he did.   *Id.* at 10.   When asked if he had any formal legal training, Applicant stated

that he had "17 different certifications."   *Id.* at 11.   Applicant refused the court's offer to

consult with a public defender before making a decision to waive counsel and represent

himself.   *Id.*   Applicant responded to the court's offer to appoint an alternate defense

counsel by stating that he was "not asking for counsel."   *Id.* at 14-15   Applicant also told

the court that he understood the risk of not properly representing himself and preparing

his defense.   When the court asked again if Applicant wished that the court appoint

counsel to represent him, Applicant stated, "No I do not want appointed counsel."

*Id.* at 12.

49

Based on the court's questions and Applicant's responses, the *Arguello* advisement sufficiently inquired into whether Applicant's waiver was knowingly and intelligently made.   It is clear from the record that Applicant "had a sense of the magnitude of the undertaking and the inherent hazards of self-representation at the time of his decision to proceed pro se."   *United States v. Taylor*, 113 F.3d 1136, 1141 (10th Cir. 1997) (citing *United States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987)).

Starting February 9, 2006, after the *Arguello* advisement, Applicant filed *pro* se fifteen documents that were motions, notifications, or objections.   Case No. 04CR706 Court File at 000352-88.   He filed *pro* se an additional six motions on February 16 and 17.   *Id.* at 000429-45 and 448-55.   At the February 22, 2006 hearing, the morning trial was to start, Applicant submitted a motion for continuance to seek advisory counsel and stated he desired to waive his right to a speedy trial.   Feb. 22 Hr'g at 8.   The trial was reset for July 6, 2006.   *Id.* at 51-52.

Up until June 27, 2006, when attorney Scheideler entered an appearance, Applicant continued to submit motions or requests.   Case No. 04CR706 Court File at 000490-494, 000501-502, 000506-516, 000518-526.   He even stated in one of the motions that, as early as November 3, 2005, he wanted to proceed *pro se* and have his attorney serve as advisory counsel.   *Id.* at 000548.

At the June 27 hearing, the court found that Mr. Scheideler's entry was not as advisory counsel, but rather was an entry of appearance as Applicant's attorney.   June 27, 2006 Hr'g at 9..   Based on the court's findings, and Applicant's failure to disagree with the findings, Applicant revoked his right to self-representation at the June 27 hearing.

From June 27 until November 7, 2006, Mr. Scheideler filed motions and appeared on Applicant's behalf at the October 13, 2006 and November 3, 2006 hearings.   The court file for Case No. 04CR706 does not reflect any *pro se* filings by Applicant from June 27 through November 3, 2006.

On November 7, 2006, Mr. Scheideler filed a motion to withdraw claiming a conflict of interest.   Case No. 04CR706 Court File at 000960.   At the November 17, 2006 hearing, Mr. Scheideler stated that Applicant had filed a lawsuit and a grievance against him.   Nov. 17, 2006 Hr'g at 13.

Applicant obtained trial continuances on two occasions, within days of the start of trial.   The first continuance was granted in February 2006 due to an alleged conflict of interest with Mr. Henry, resulting in Applicant unequivocally asserting he wanted to proceed *pro se*.   The second continuance was based on Applicant's request that Mr. Scheideler be allowed to participate as an advisory counsel days before his trial was to begin on July 6, 2006.   The trial court, however, would not grant a continuance based on an advisory counsel request, but allowed a continuance for Mr. Scheideler to prepare for trial as counsel of record.   Finally, Mr. Scheideler was allowed to withdraw due to a conflict of interest shortly before the trial was to begin on November 2006.   When Mr. Jurdem filed a conditional appearance, the trial court denied the request and told Mr. Jurdem the only way he could enter an appearance was if he could proceed to trial within a day and a half.

During the June 27, 2006 hearing, the court noted the manipulative aspect of Mr. Scheideler entering as advisory counsel and being allowed a continuance.   June 27, 2006 Hr'g at 9.   The trial court relied on Dr. Chamberlin's mental evaluation to find that

51

Applicant is highly intelligent, understands the criminal justice system very well, and will use the means available to him at the moment to accomplish his goals, including threatening suicide and litigation and intimidating those around him.   The court further determined that Applicant had a right to a trial, but, given the past machinations in the case, there were other rights involved, including the rights of the alleged victim to have the matter resolved in a timely fashion.

The state court record supports the CCA's finding that, following Mr. Scheideler's withdrawal, Applicant impliedly waived his right to counsel.   Applicant repeatedly failed to maintain a working relationship with counsel, threatened counsel, filed meritless motions, and fired counsel as the trial date approached.   The trial court record also supports the CCA's conclusion that Applicant is highly intelligent and was fully aware that he was manipulating the legal system.   Finally, as found by the CCA, the trial court's decision to deny a continuance of the November 2006 trial and Mr. Jurdem's conditional appearance did not violate Applicant's Sixth Amendment right to counsel.   The requests were untimely and lacked a showing of good cause.

The Court, therefore, finds that the state court's decision to dismiss Applicant's claim that he was forced to trial without counsel over his objections in violation of his Sixth Amendment rights was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts.   This claim, therefore, lacks merit, and Applicant is not entitled to relief.

### 2.   *Claims Two and Three*

In Claim Two, Applicant asserts that when he was arrested the county jail declared him mentally unstable and prescribed him psychotropic medications, which were mind altering and included Haldol, Amitriptyline Hcl, Tegretal, Risperdal, Viseral, Cogentin, and Depakote.   Docket No. 8 at 14   Applicant further asserts that, by the time of his trial, he was addicted and relied on the drugs to function, but the night before his trial the jail medical staff discontinued the prescribed medications.   *Id.*   Finally, Applicant asserts that he required a brief delay in the trial to overcome the withdrawal side effects, but his motion was denied in violation of his due process rights.   *Id.*

In Claim Three, Applicant asserts that, based on his mental health evaluations conducted after the trial and his request for a temporary delay during the trial to overcome his withdrawal side effects, he raised a substantive due process claim that he was incompetent to stand trial, which the trial court summarily denied in violation of his due process rights.   Docket No. 8 at 15.

Applicant further asserts in the Reply that before the second day of trial he requested a temporary delay of proceedings because he was subject to an abrupt withdrawal of a psychotropic medication, but the trial court denied the motion without a hearing or directing a medical or psychological examination and only allowed him to drink a glass of water, even though Applicant complained he was experiencing confusion, hearing and vision problems, headaches, nausea, irritability, racing heartbeat, anxiety, restless, and hyperactivity.   Docket No. 68 at 38-40, 42.   Applicant also asserts that throughout the trial he raised his medical issues regarding confusion, racing heart, and high blood pressure and cites to the trial transcript, Nov. 30, 2006 at 256, Dec. 1, 2006 at

8, 13, and 80, and Dec. 11, 2006 at 67, for support of this claim.   *Id.* at 40.   Applicant

states that the trial court denied Applicant's requests for delay and recess because his

performance was adequate.   Applicant cites to the trial transcript, Nov. 30, 2006 at 73,

111, and 112, in support of this claim.   *Id.*   Applicant contends that he may have been

competent to stand trial, but he was not competent to present his own defense without the

help of counsel, and any claim that he withdrew his own competency motion is contrary to

established federal law.   *Id.* at 40-44.

Finally, Applicant states that the trial court failed to hold a hearing and evaluate his

alleged symptoms at the time of trial.   *Id.* at 42.   He further contends that, at his

sentencing hearing on January 22, 2008 his motion to reconsider the ruling that Applicant

had waived counsel and was competent to proceed at trial was denied, even though the

presentence and psychosexual evaluation noted that (1) his verbal abstract reasoning

was borderline retarded range; (2) he was unable to understand information; and (3) he

had moderate Posttraumatic Stress Disorder, severe anxiety, and possible

schizophrenia.   *Id.*   Applicant concludes that he has a substantive due process right to

be competent before facing trial and a procedural due process right for proceedings to be

conducted when a competency issue is raised.   *Id.* at 40.

In addressing this claim, the CCA found as follows:

### V. Competence

Defendant contends the trial court did not make an adequate inquiry
into his mental and physical competence to proceed at trial and to represent
himself.   He argues that the court abused its discretion when it refused his
requests for breaks "due to his medical condition and its related mental
effects."   We are not persuaded.

A. Law

A defendant is presumed to be competent to stand trial and it is the defendant's burden to prove that he or she is not competent.   *People v. Palmer*, 31 P.3d 863, 866 (Colo. 2001).   However, "[p]utting an accused on trial while he [or she] is incompetent violates due process of law."   *Id.* (quoting *Jones v. District Court*, 617 P.2d 803, 806 (Colo. 1980)).

At the time of defendant's trial, the applicable statutes provided that "[n]o person shall be tried, sentenced, or executed if such person is incompetent to proceed at that stage of the proceedings against him or her." Ch. 26, sec. 10, § 16-8-110(1)(b), 1995 Colo. Sess. Laws 76 (repealed by Ch. 389, sec. 8, 2008 Colo. Sess. Laws 1855, effective July 1, 2008).   A defendant is "incompetent to proceed" if he or she suffers from a mental disease or defect that renders him or her incapable of (1) understanding the nature and course of the proceedings against him or her, or (2) participating or assisting in his or her defense or cooperating with his or her counsel. Ch. 44, sec. 1, § 39-8-102(1), 1972 Colo. Sess. Laws 225 (later codified at § 16-8-102(3); repealed by Ch. 389, sec. 15, 2008 Colo. Sess. Laws 1850, effective July 1, 2008).

More specifically, to be competent, a defendant must have "a sufficient present ability to consult with his counsel with a reasonable degree of rational understanding, and a present rational and factual understanding of the proceedings against him."   *People v. Mondragon*, 217 P.3d 936, 940 (Colo. App. 2009) (emphasis omitted) (quoting *People v. Morino*, 743 P.2d 49, 51 (Colo. App.1987) (citing *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L.Ed.2d 824 (1960)).   The *Dusky* standard applies equally to whether a defendant is generally competent and whether a defendant is competent to choose to exercise or waive his or her constitutional rights.   *Mondragon*, 217 P.3d at 940 (citing *Godinez v. Moran*, 509 U.S. 389, 398-99, 113 S. Ct. 2680, 125 L.Ed.2d 321 (1993) (*Dusky* standard applies to a defendant's decision to waive the right to counsel)).

Under the *Dusky* standard, a defendant lacks the requisite rational understanding "if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him."   *Mondragon*, 217 P.3d at 940 (quoting *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1991)).

A defendant's competence to stand trial is a question of fact.   We uphold a trial court's competency determination absent an abuse of discretion.   *Palmer*, 31 P.3d at 865-66; *see also People v. Stephenson*, 165 P.3d 860, 866 (Colo. App. 2007) ("Because the trial court is in the best

position to observe the defendant's general demeanor, its determination of competency will be upheld absent an abuse of discretion."). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *Stephenson*, 165 P.3d at 866.

## B. Trial Court Proceedings

Before the second day of trial began, defendant asked that the trial be suspended because his withdrawal from a medication was interfering with his ability to concentrate and think clearly "at all times." When the trial court asked if he was asserting that he was incompetent to proceed, defendant responded that he was mentally competent but that he was "medically" unfit to represent himself "fluidly" because he gets dry mouth and his heart races.

The court denied defendant's motion, finding that there was "absolutely no evidence" that defendant was not competent to proceed. The court allowed defendant to take water with him to the podium and to readdress the issue several hours later after consulting with advisory counsel. After consulting with counsel, defendant chose to withdraw his motion and proceed with trial. Defendant did not raise his motion again during trial.

On the third day of trial, defendant said that he was talking fast and that his heart was racing because he was overdue for his medication. However, he did not say that it was interfering with his ability to proceed with the trial. The court called a recess to allow defendant to take his medication, and an hour later defendant said he was feeling better and that his heart was no longer racing.

Before closing arguments on the tenth day of trial, defendant said that he had just taken his medication and that it had not taken effect yet. As a result, his "blood pressure [was] flying." Although defendant said that he did not think it was "a good idea" for him to address the jury because he did not want "to start talking pretty fast," he said it was up to the court to decide whether to proceed. The court noted that the previous time defendant was delayed in taking his medication, he conducted a cross-examination of a witness that was "cogent, direct, structured, [and] had a beginning point and an ending point." The court then denied defendant's request for a recess.

## C. Analysis and Conclusion

We conclude that the trial court did not abuse its discretion. The record shows that defendant voluntarily withdrew his motion after consulting with counsel and expressly stated that he was mentally competent to proceed at trial.   Defendant did not raise this motion again and did not argue that withdrawal from his previous medication was adversely affecting him again during trial.

Similarly, when defendant said that his medications were affecting him, the court responded by allowing him to drink water, calling recesses to allow defendant to take his medication, and following up with him afterwards about how he felt.   The record also supports the trial court's findings that defendant's medication was not interfering with his ability to proceed at trial or represent himself.   Our review of the record shows that defendant was quite effective at cross-examining witnesses, making objections, arguing his position to the court, and presenting his case to the jury.   This is also evident by the number of defendant's objections the court sustained and the fact that the jury did not convict defendant on all charged counts.

We are not persuaded otherwise by defendant's argument that the trial court misapplied the correct legal standard when evaluating whether he was competent to proceed.   *See Indiana v. Edwards*, 554 U.S. 164, 173-74, 128 S. Ct. 2379, 2385-86, 171 L.Ed.2d 345 (2008) (recognizing that mental illness varies in the degree and defendants' competency may fall within a "gray area" in which they are competent to stand trial but not to represent themselves).   Even assuming that the *Edwards* competency standard applies not only to diagnosed mental illnesses but also to temporary side effects from medications, applying a higher standard here would not alter our conclusion.   Despite his expressed frustration with the court and its rulings, defendant represented himself ably and there is no evidence in the record to indicate that he was incompetent to proceed at trial or to represent himself.

We also reject defendant's contention that the former statutes were unconstitutional on their face and as applied by the court because those statutes were not applied to him during trial.   On appeal, defendant bases his argument on the motion he withdrew after consulting with advisory counsel.   Because defendant withdrew this motion, explicitly said he was not challenging whether he was mentally incompetent to proceed, and did not raise the issue again during trial, those statutes were not applied to defendant.   Therefore, we need not consider defendant's constitutional challenges to those statutes on appeal.

Accordingly, we conclude that the trial court did not abuse its discretion when it found defendant competent to proceed at trial and to represent himself.

Docket No. 17-2 at 19-26

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992) (citing *Drope v. Missouri*, 420 U.S. 162 (1975); *Pate v. Robinson*, 383 U.S. 375 (1966)).   "The right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination."   *Cooper v. Oklahoma*, 517 U.S. 348, 354 n.4 (1996).

"[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his [procedural] due process right to a fair trial."   *Drope*, 420 U.S. at 172 (citing *Pate*, 383 U.S. 375).   The U.S. Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure," *Drope*, 420 at 172, but it has held that a hearing is required where the evidence before the trial judge raises a "bona fide doubt" as to a defendant's competence, *Pate*, 383 U.S. at 385 ("Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to [the Illinois competency statute at issue].").   *See Porter v. McKaskle*, 466 U.S. 984, 985–86 (1984) (Marshall, J., dissenting) ("It is settled that, if evidence available to a trial judge raises a bona fide doubt regarding a defendant's ability to understand and participate in the proceedings against him, the judge has an obligation to order an examination to

assess his competency, even if the defendant does not request such an exam.") (citing

*Drope* and *Pate*); *Drope*, 420 U.S. at 172–73 (stating that the *Pate* Court "noted that

under the Illinois statute a hearing was required where the evidence raised a 'bona fide

doubt' as to a defendant's competence"); *United States v. Newman*, 733 F.2d 1395, 1400

(10th Cir.1984) ("A trial court must order a hearing to determine the defendant's

competency if information comes to the trial court's attention that raises a bona fide doubt

about the defendant's competency to stand trial." (citing *Pate*, 383 U.S. at 385)).   The

Supreme Court also has stated that

> evidence of a defendant's irrational behavior, his demeanor at trial, and any
> prior medical opinion on competence to stand trial are all relevant in
> determining whether further inquiry is required, but that even one of these
> factors standing alone may, in some circumstances, be sufficient. There
> are, of course, no fixed or immutable signs which invariably indicate the
> need for further inquiry to determine fitness to proceed; the question is often
> a difficult one in which a wide range of manifestations and subtle nuances
> are implicated.

*Drope*, 420 U.S. at 180.

The Tenth Circuit has recognized that "[c]ompetency to stand trial is a factual

question."   *Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir.1999).   Accordingly, the

Court must "afford the state court's finding of competency a presumption of correctness

[pursuant to 28 U.S.C. § 2254(e)(1)] unless [Applicant] rebuts the presumption by clear

and convincing evidence."   *Wallace v. Ward*, 191 F.3d 1235, 1243 (10th Cir. 1999).   To

succeed on a procedural competency claim, the burden is on the applicant to present

facts that "establish that a reasonable judge should have had a bona fide doubt as to his

competence at the time of trial."   *Gilbert v. Mullin*, 302 F.3d 1166, 1180 (10th Cir. 2002).

As stated above, the CCA concluded that,

> [e]ven assuming that the *Edwards* competency standard applies not only to diagnosed mental illnesses but also to temporary side effects from medications, applying a higher standard here would not alter our conclusion.   Despite his expressed frustration with the court and its rulings, defendant represented himself ably and there is no evidence in the record to indicate that he was incompetent to proceed at trial or to represent himself.

Docket No. 17-2 at 25.

On November 28, 2006, Applicant filed a motion *in limine*, in which he stated that the medication he had been given for pain, was not an anti-inflammatory drug, but an anti-depressant or psychotropic drug that was stopped on November 27 without any notice.   Case No. 04CR706 Court File at 000987.   Applicant contended that, as a result, he was suffering from side effects of the withdrawal of Amitriptyline Hcl and other medical issues.   *Id.* at 000988.   Applicant listed a variety of side effects caused by taking and then discontinuing the drug as follows: (1) confusion; (2) hearing disorder; (3) dry mouth; (4) blurred vision; (5) severe headaches; (6) body discomforts; (7) irritability; (8) panic attacks; (9) rapid and irregular heartbeats; (10) serious anxiety; (11) restlessness; (12) brief hyper-activity; (13) severe back and muscle pain; and (14) involuntary muscle movements and shaking.   *Id.*   Applicant conceded that these symptoms will "vanish" in time, but the "original symptoms will not."   *Id.*   Applicant concluded that he was "not raising a competency matter," but was placing the trial court "on notice" that due to medical matters he is not healthy and will not be able to "keep up with the District Attorney's case as well as keep focused on the defendant's own defense."   *Id.*

On the second day of trial, Applicant stated to the judge that he was not "medically fit" to complete the ten minutes of his opening statement, but he was not "like a mail bomb

crazy incompetent,"   Nov. 29, 2006 Trial Tr. at 30-31.   Applicant stated that he was

experiencing a dry mouth and would talk too fast to present the remaining portion of his

opening statement.   *Id.* at 30.   Applicant also acknowledged that on November 28,

2006, he was allowed to take water to the podium when he talked.   *Id*

A review of Applicant's opening statement made on November 28 finds the

twenty-four page transcribed statement was a coherent narrative by Applicant.   Nov. 28,

2006 Trial Tr. at 279-302.   Prior to starting his opening, Applicant asked if he could bring

the cup of water to the podium while he talked, which he was allowed to do.   *Id.* at 279.

He told the jury he was nervous, *id.,* but on only one occasion did the reporter ask him to

slow down in the twenty-four pages of transcript, *id.* at 296.   At no time during the

opening did Applicant state that he was confused or unable to continue due to any of the

alleged side effects of withdrawal from the psychotropic medications.   This Court also

notes that on November 28, 2006, the first day of trial, Applicant indicated he had

completed his statement because the trial court would not allow him to tell the truth.

*Id.* at 302.

On November 29, 2006, before the jury was called in, Applicant stated that he did

not need advisory counsel to be present for the trial to proceed and requested that the

court consider the three motions *in limine* that he had filed.   Nov. 29, 2006 Trial Tr. at 6-7.

Applicant presented his sequestration of witnesses motion *in limine* without any indication

that he was suffering from the fourteen noted side effects.   *Id.* at15-18.   Similarly,

Applicant presented and argued his second motion *in limine* concerning a theory of

defense jury instructions.   *Id.* at 20-24.   Specifically, Applicant asked the court to allow

him to argue in his opening statement that the court, the prosecution, and law

enforcement were setting him up.   Case No. 04CR706 Court File at 000983-985.   In response to the prosecution's motion *in limine* regarding impeachment of witnesses, Applicant also argued his position.   Nov. 29, 2006 Trial Tr. at 10-11.   Finally, Applicant composed and submitted the three motions in *limine* to the trial court on the evening of November 28, 2006.   *See id.* at 000983-990.

Even if the Court finds temporary side effects from medications are subject to the same scrutiny as an incompetency finding under *Edwards,* it is clear that the trial court's (1) treatment of Applicant's motion *in limine* regarding alleged withdrawal side effects and (2) decision to proceed, without Applicant completing the remaining ten minutes of his opening statement, was not a violation of Applicant's due process rights.   Based on the Court's review of the trial record for November 28 and 29, 2006, and Applicant's motion *in limine* regarding the effects of discontinuing his psychotropic or antidepressant medications, there is no evidence to indicate Applicant was incompetent to represent himself at trial on November 28 and 29, 2006.   Nothing in the record supports a finding that there was a need for a hearing to determine Applicant's competency because nothing in the record raises a bona fide doubt about the defendant's competency to stand trial or to proceed *pro se.*

Based on all factors before the trial court, including Applicant's ability to compose the three motions *in limine*, and to argue coherently in support of the motions on November 29, 2004, there was a sufficient basis to deny any request for a delay to conduct a hearing regarding Applicant's alleged medical issues.   The CCA's statement that Applicant's actions were more a frustration with court rulings than an alleged inability to competently proceed *pro se* is well supported by the trial record.

Applicant identifies other parts of the trial record, November 30, 2006 at 256, December 1, 2006, at 8, 13, and 80, and December 11, 2006 at 67, which he asserts indicate his due process rights were violated by the trial court in ignoring his claims of lack of sleep and adequate nutrition, a racing heart, and high blood pressure.   Docket No. 68 at 41-42.   The November 30, 2006 trial transcript does not refer to Applicant's withdrawal side effects, but rather to his need to review certain documents, and to the limited time he has to do the review and to eat because he has to be in trial.   Nov. 30, 2006 Trial Tr. at 256.   On December 1, 2006, Applicant states to the court, while the jury was out, that he is talking "super fast" because he was supposed to have his medication two hours ago, his "heart is flying," and he was waiting for someone to "bring them up."   Dec. 1, 2006 Trial Tr. at 8.   The same day, Applicant asked if the trial could be stopped when the nurse brought his medication.   *Id.* at 13.   The court told Applicant to ask for a recess if he needed one.   *Id.*   Later on December 1, the trial court asked Applicant to slow down, to which Applicant indicated he was slowing down as much as possible.   *Id.* at 80.   The trial transcript for the cross-examination that followed on pages 85 through 131, contains no request by the court or the court reporter for Applicant to slow down.   *Id.* at 85-131.

Finally, on December 11, 2006, Applicant stated that he did not have his blood pressure medication in a timely manner and, because his heart is racing, he is afraid he will talk too fast in front of the jury in his closing statement.   Dec. 11, 2006 Trial Tr. at 67. A review of the trial transcript for December 11, 2006, specifically of pages 69-116, which includes Applicant's closing statement, shows no request by the court or the court reporter for Applicant to slow down with his presentation.

None of these record citations raise a bona fide doubt about the defendant's competency to stand trial or to proceed *pro se*.   Applicant, therefore, has failed to meet his burden of showing with clear and convincing evidence that the state court's factual determinations are incorrect.

Accordingly, the trial court's refusal to delay trial proceedings to conduct a hearing regarding Applicant's medical issue, and the trial court's decision that Applicant was medically competent to continue *pro* se with trial proceedings, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   Claims Two and Three, therefore, will be dismissed for lack of merit.

The Court also notes Applicant's Reply, for the first time in any postconviction filing (state or federal), asserts in support of his competency claim that the trial court denied a further psychiatric evaluation even though the presentence investigative and psychosexual evaluation noted Applicant had (1) verbal abstract reasoning that was in the borderline retarded range; (2) an impairment of ability to understand information; (3) significant Post Traumatic Stress Disorder; (4) severe levels of anxiety; and (5) chronic tendencies towards disjointed illogical thoughts.   Docket No. 68 at 42.   Applicant also contends that the evaluation noted Applicant may have been suffering from schizoid personality disorder or even schizophrenia.   *Id.*   The Court will not address a new claim or supporting fact when presented to the Court for the first time in a reply.   *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1119 (10th Cir. 2015).   The Court further notes that the presentence evaluation issue was not presented in Applicant's direct appeal.

64

Finally, Applicant has attached two affidavits to the Reply.   One affidavit was prepared by Mr. Jurdem, Applicant's advisory attorney for the trial, who states that if Applicant "had been represented by a reasonably well-trained criminal defense attorney, he would likely have been acquitted at trial."   Docket No. 68-1 at 5.   The other affidavit was prepared by Mr. Heher, Applicant's counsel retained on direct appeal, who states that there was no record from which the trial court or the CCA "could legitimately conclude that [Applicant] had somehow 'waived' his right to counsel."   Docket No. 68-2 at 2.   The Court will not consider either affidavit.   A review of a state court decision under § 2254(d)(1) is limited to the record before the state court.   Neither affidavit was at issue before the trial court.   *See Cullen,* 563 U.S. at 181; *Cole v. Trammell*, 755 F.3d 1142, 1153 n.3 (10th Cir. 2014); *see also Ross v. Thaler*, 511 F. App'x 293, 305 (5th Cir. 2013**)** (federal district court correctly refused to consider trial counsel's affidavits).

### 3.   *Claim Five*

In Claim Five, Applicant asserts that on May 2, 2006 he filed a motion for a bill of particulars asking the State to explain the exact date and time the criminal acts took place that he allegedly committed; the motion was granted.   Docket No. 8 at 16.   Applicant further asserts that, although he had an alibi and was not at the alleged location at the date and time indicated in the bill of particulars, the trial court refused to instruct the jury on the date and location and told that jury the date and location of the crime did not matter.   *Id.* at 16.   Finally, Applicant argues that he was denied a fair trial because he was stripped of his alibi defense.   *Id.*

Applicant, through counsel, further asserts in his Reply that the trial court granted the motion for a bill of particulars, rejected the prosecution's reliance on a "date range,"

and required the prosecution to specify a date, which was "the night in question is October 3-4, 2004.   Docket No. 68 at 45.   Applicant contends that his entire trial strategy was based on the prosecution's specification of October 3-4, 2004 as the date of the offense; that "fundamental constitutional rights to due process and fundamental fairness require that a defendant be placed on adequate notice of the precise charges against him"; that the prosecution is limited to proof at trial of the described areas in the bill of particulars and he has a right to be placed on sufficient notice of the offense with which he was charged; and that the trial court allowed the prosecution to use a broad date range, after requiring them to state a specific date in response to Applicant's motion for a bill of particulars, which effectively changed the charging document.   Docket No. 68 at 46, 48. In conclusion, Applicant asserts that the trial court violated his due process rights under *Ex Parte Bains*, 121 U.S. 1, 7 (1887), which he says has never been disapproved and stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him when the trial court told the jury it could find him guilty if they found the date of the offense was anytime within a six-week period.   *Id.*

The CCA found as follows:

### III. Jury Instructions

Defendant contends the trial court "fail[ed] to enforce the bill of particulars" when it instructed the jury based on the complaint and information, and not the bill of particulars.   Defendant also contends the trial court erred by refusing his tendered instruction regarding the limited purpose of the evidence admitted under CRE 404(b).   There were no errors.

### A. Law Regarding Jury Instructions

Trial courts have a duty to correctly instruct juries on matters of law. *Bedor v. Johnson*, 2013 CO 4, 9; *People v. Doubleday*, 2012 COA 141, 38.

To determine whether the trial court has performed this duty, we first review de novo the jury instruction at issue to assess whether the instruction correctly states the law.   *Bedor*, at 9.   If it does, we then review the trial court's decision to give the jury instruction for an abuse of discretion.   *Id.* A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair.   *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002).

### B. Bill of Particulars

Counts 1 through 9 and count 14 alleged that between September 1, 2004 and October 18, 2004, defendant induced and solicited the victims for child prostitution, sexually exploited them, and sexually assaulted them.   In response to a motion for a bill of particulars that was granted in part by the court, the prosecution said that the acts alleged in counts 1 through 9 and count 14 happened on the same night and "[i]t is believed from the best information in discovery that the night in question is October 3-4[ ], 2004."

The implicit premise of defendant's argument on appeal is that the prosecution's bill of particulars amended the date of the offenses alleged in the charges and required the court to instruct the jury to determine whether the offenses occurred on the dates stated in the bill of particulars.   We are not persuaded.

### 1. Trial Court Proceedings

The victims testified that the charged acts occurred during the night of October 3 to 4.   During cross-examination, the victims described the location, time of day, and circumstances of the alleged acts, but had difficulty remembering some of the details.   One victim said that the acts may have occurred on October 6.   Much of defendant's case focused on the victims' credibility and the testimony that the alleged acts may have occurred on October 6, as to which defendant presented alibi evidence showing that he was not at home on that date.

Defendant argued that the jury instructions should say that the prosecution was required to prove that the offenses occurred on October 3 and 4.   The court rejected defendant's argument and instructed the jury that the charges were alleged to have occurred "between and including September 1, 2004 and October 18, 2004."

### 2. Law Regarding Bill of Particulars

"The right to seek a bill of particulars provides the defendant and the trial court with a procedure by which the defendant can be provided with further detail in advance of trial sufficient to facilitate trial preparation."

*Thomas v. People*, 803 P.2d 144, 154 (Colo. 1990); see Crim. P. 7(g).   For example, "where there is evidence of many acts, any one of which would constitute the offense charged, the prosecution may be compelled to select the transaction on which it relies for a conviction."   *Thomas*, 803 P.2d at 152.   In such circumstances, the prosecution is not required to specify the exact date the offense took place, but it must specify a particular act "to ensure unanimous jury agreement that the defendant had committed the same act and to enable the defendant to prepare a defense to the specific act charged."   *Id.*; *see People v. Estorga*, 200 Colo. 78, 81, 612 P.2d 520, 523 (1980).   A bill of particulars is not the same as an amended complaint and information.   Compare Crim. P. 7(g) (bill of particulars), with Crim. P. 7(e) (amending of information); *see also Erickson v. People*, 951 P.2d 919, 921 (Colo. 1998) (a bill of particulars is an informational tool for the defense that is "intended to define the charged offense more specifically").

### 3. Analysis and Conclusion

We reject defendant's contention that the court erred when it instructed the jury that the prosecution was required to prove that the offenses occurred between September 1, 2004, and October 18, 2004.

In the bill of particulars, the prosecution said "[i]t is believed from the best information in discovery that the night in question is October 3-4[], 2004."   Consistent with those particulars, the witnesses testified that the offenses occurred on October 3 and 4.   These dates are also within the period alleged in the complaint and information.

When defendant questioned the witnesses, they manifested some uncertainty about the exact date of the events.   One victim agreed that the offenses may have occurred on another date, and, perhaps, on October 6. Defendant then attempted to prove that the offenses could not have occurred on that date because he was not home.   From this, defendant argued that the victims' description of the offenses should not be believed.

We reject defendant's contention that the court failed to enforce the bill of particulars and abused its discretion when it instructed the jury that the prosecution was required to prove that the offenses occurred during the period from September 1, 2004 to October 18, 2004, rather than on October 3 and 4.   The prosecution's evidence was consistent with the bill of particulars and that evidence, as well as defendant's alibi evidence, pertained to dates within the period alleged in the complaint and information.

We conclude that the bill of particulars did not amend the complaint and information, the court's instruction properly advised the jury regarding

the elements of the offenses and the prosecution's burden of proof, and the court did not abuse its discretion when it declined to modify the instruction. Moreover, the verdict demonstrates that the jury agreed, beyond a reasonable doubt that the offenses occurred during the period alleged. Accordingly, we perceive no instructional error.

Docket No. 17-2 at 9-14.

The Court may grant habeas relief in a challenge to the adequacy of the information only if the state court error deprived the defendant of fundamental rights guaranteed by the Constitution. *Knewel v. Egan*, 268 U.S. 442, 446–47 (1925); *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir.1999). Under the Sixth and Fourteenth Amendments, a defendant is entitled to fair notice of the criminal charges against him, and claims of due process violations in not providing such fair notice are cognizable in habeas corpus actions. *See Hunter v. State of New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990); *Franklin v. White*, 803 F.2d 416 (8th Cir. 1986), *cert. denied*, 481 U.S. 1020 (1987). The sufficiency of a state charge is determined by the Sixth Amendment right "to be informed of the nature and cause of the accusation." *United States v. Cruikshank*, 92 U.S. 542, 557-58 (1875) (internal quotations and citations omitted); *In re Oliver*, 333 U.S. 257, 273 (1948); *Rabe v. Washington*, 405 U.S. 313 (1972).

Where the charge embodies the wording of the statute, which is fully descriptive of the offense, it is constitutionally sufficient. *Potter v. United States*, 155 U.S. 438 (1894). The sufficiency of an information is not a federal habeas issue unless the information is so deficient that the convicting court was deprived of jurisdiction. *Ferguson v. Davies*, No. 91-3052, 1991 WL 159849 at *6 (10th Cir. 1991) (unpublished) (citing *Heath v. Jones*, 863 F.2d 815 (11th Cir. 1989)); *Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir. 1987).

The Complaint and Information set forth fourteen counts against Applicant. *See*

69

Case No. 04CR706 Court File at 000110-111.   The description of each of the counts referred to the dates between and including September 1, 2004 through October 18, 2004 as the time during which each of the counts took place.   *Id.* at 00012-14.

On April 27, 2006, Applicant filed, *pro* se, a motion for a bill of particulars, in which he requested that the prosecution, among other things, "explain exactly what it is alleged he has done and to whom and SPECIFICALLY WHAT DATE THE ALLEGED CRIMINAL ACTS TOOK PLACE."   *See id.* at 000564.   Applicant further argued that "[he] needs to know if The People are alleging that any criminal acts took place between the hours of approximately 10:30 pm and 8:20 am on the date of October 3, 2004."   *Id.*

When the motion for a bill of particulars was considered, at the time of the September 1, 2006 hearing, Applicant was represented by Mr. Scheideler.   Sept. 1, 2006 H'rg at 1.   Mr. Scheideler stated at the hearing that the specific criminal acts at issue are any alleged sexual acts between J.R. and N.M. that took place on Saturday into Sunday. *Id.* at 3.   The prosecution conceded that all sexual acts took place on one night and the date referred to in discovery is October 3-4, 2004.   *Id.* at 4.   Upon briefing by both Applicant and the prosecution at the September 1, 2006 hearing on the issue, the trial court decided as follows:

> THE COURT:   All right.   Thank you
>
> What the court's going to do is the following:   The court notes that there has certainly been discovery produced.   The court has reviewed statements with respect to the events that are in question here.   The court is going to grant a motion for bill of particulars in a somewhat limited sense.
>
> The court finds that while the defendant needs to be put on notice certainly for the purposes of jeopardy and for the purposes of preparing for trial, the People have specified about a two-month time period.   I believe that the People are indicating and confessing today that they can narrow

70

that down for certain offenses, in particular the offenses alleging some kind of sexual misconduct between the defendant and the two named victims. The court is going to grant the bill of particulars with respect to those counts.

What I will require is the People to provide within 15 days of today's date a more precise time period for the counts in which they are alleging the sexual misconduct of the defendant.   I am not going to specify or require or list those counts right now.   I don't know if there's other evidence that might have taken place on other days that could, for example, be part of an exploitation count, but I will require certainly the People – I believe we're all talking about the same thing when it comes to the sexual conduct or conduct alleged victims here that there be more specificity.   So I'll require the People to provide with more specificity the dates for those offenses, and I'll require that within 15 days.

*Id.* at 5-6.

On the same day as the September 1 hearing, the prosecution entered a bill of

particulars that states, "[t]he People inform the court that the acts alleged in counts 1-9

and count 14 all happened on the same night.   It is believed from the best information in

discovery that the night in question is October 3-4th, 2004."   Case No. 04CR706 Court

File at 000912.   This Court notes that counts 1-6, 9, and 14, pertain to sexual assault or

exploitation of either J.R. or N.M.   *Id.* at 000113.

The colloquy between the trial court, Applicant, and the prosecution regarding the

jury instruction that pertains to the date and place instruction reads as follows:

THE COURT: . . . The next one is the charging instruction, which is, The [sic] defendant, Delmart Vreeland, is charged with committing the crimes of inducement of child prostitution, et cetera.   Mr. Vreeland, your position on that instruction?

THE DEFENDANT: First objection I have to it is I want it to specifically say the date and the place where this alleged crime took place. And then I also want it to state the exact date that they're saying this crime took place; here it says between September 1st, 2004, and October 18th, 2004; but the Bill of Particulars specifically says October 3d to October 4th, 2004.

So I -- I want it to be changed so it reflects the specific date and the specific address, date where the crime -- the date when the crime took place and the address where it allegedly took place.

THE COURT: Mr. Vahle?

MR. VAHLE: Judge, the charging document speaks for itself and this tracks the language of the charging document I believe that the People prepared.

THE COURT: Mr. Vreeland, reply?

THE DEFENDANT: If the court is going to – is not going to do that, I'd like to tender my proposed version.   I already have it typed out.

THE COURT: All right. Why don't you have Mr. Jurdem submit that.

The court will deny the request to specify date and place finding that they are -- at this particular point in time, the charging document reflects the nature of the allegations and when they are alleged to have occurred.

Discrepancies or disputes are factual matters to be addressed and to be argued to the jury.   The court does not believe that location is an essential element of the offense.   In fact, it's a statewide jurisdictional question, if you would.   So the court will deny the defendant's tendered instruction.   The next instruction –

THE DEFENDANT: Well, Your Honor, do you remember ordering a Bill of Particulars for this?

THE COURT: I certainly do.

THE DEFENDANT: So I'm wondering -- I don't understand now why when the Bill of Particulars, I'm just curious, or -- specifically say October 3d, why he's now changing it to give them any time span he wants?   And in the closing argument, if the jury is convinced that it didn't happen, well, you're just saying in Douglas County; if something happened somewhere else and I prove it, then I should be able to say that, you know, narrow it down to exactly where the crime happened and exactly when it allegedly happened; not just, hey, if something -- you think something happened any time between here and there at any given place, you'll find him guilty.

THE COURT: I believe I've addressed that in my ruling and will not -- will adhere to its previous ruling.

Dec. 8, 2006 Trial Tr. at 265-68.

Based on the above findings, Applicant had sufficient notice of the charges against him to prepare his defense.   The complaint and information of the charges that pertain to the sexual assaults and exploitations committed against J.R. and N. M., counts 1-6, 9, and 14, embody the wording of the statute and are fully descriptive of the offense. Applicant's bill of particulars argument, therefore, does not demonstrate that the complaint and information was so insufficient that the convicting court was deprived of jurisdiction.

Applicant further had sufficient notice regarding counts 1-6, 9 and 14 from the prosecution's bill of particulars, which informed him that it was "believed from the best information in discovery that the night in question is October 3-4th, 2004."   Case No. 04CR706 Court File at 000912.   Applicant also had access to the discovery, which addressed the date and place in question.   The Court, therefore, finds no basis for prejudice based on the trial court's refusal to specify in the jury instruction that the date of the offenses was not limited to October 3 through 4, 2004.

Even if this Court were to find constitutional error in the trial court's denial of a specific date instruction regarding when counts 1-6 , 9 and 14 took place, under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict.   *Brecht*, 507 U.S. at 637.   As found by the CCA, and this Court's review of the records, the victims testified that the charged acts occurred October 3 through 4.   Even though the victims had difficulty remembering

73

some details, they were able to describe the location, time of day, and circumstances of the alleged acts.   One victim said that the acts may have occurred on October 6. Applicant then focused on the victims' credibility and the testimony that the alleged acts may have occurred on October 6, 2004, which was subject to Applicant's alibi evidence showing that he was not at home on that date.   Applicant used the dispute over the date of offense to impeach the prosecution's witnesses.   He fails to establish that the jury instruction with a date range of September 1 through October 18, 2004, rather than October 3 through 4, 2004, was a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 637.

The CCA decision regarding Applicant's bill of particulars claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   This claim, therefore, lacks merit and will be dismissed.

### 4.   *Claim Ten*

In Claim Ten, Applicant asserts that the trial court's refusal to limit the jury's consideration of extremely prejudicial evidence admitted under Colo. R. Evid. 404(b) was error and violated his Sixth and Fourteenth Amendment rights; that the trial court allowed evidence under Colo. R. Evid. 404(b) and Colo. Rev. Stat. § 16-10-301 that Applicant had offered money to two witnesses (L.A. and J.O.) to have them pose for pictures and that the witnesses were under eighteen years of age; that the court allowed the evidence without an offer of proof or testimony, prior conviction, or any prior allegation or suspicion,

and even allowed the evidence that the two witnesses were under eighteen when they posed for the pictures; and that the trial court refused to instruct the jury as to the limited purposes under which they could consider the evidence under Colo. R. Evid. 404(b). Docket No. 8 at 20.

In the Reply, Applicant, through counsel, asserts that prior to trial the prosecution moved to admit "other act" evidence regarding Applicant's relationship with L.A. for "limited purposes" under Colo. R. Evid. 404(b), which was granted.   Docket No. 68 at 51. Applicant asserts that L.A. testified to sexual contact, drug activity, illegal sharing of alcohol, and photographing him partially clothed.   *Id.*   All of these claims involved activities that took place between Applicant and L.A.   *Id.*

Applicant claims that he asked the court to instruct the jury that L.A.'s testimony was admitted for limited purposes under Rule 404(b) and that the "other act" evidence involving L.A. or J.O., or any dates other than October 3 and 4, be admitted for limited purposes.   *Id.*   Applicant asserts that the trial court refused the tendered instruction and ruled the "standard or 'stock' " instruction was sufficient.   *Id.* at 52.   Applicant also contends the CCA's finding that his "naïve comment," made months before trial, in which Applicant agreed to the admission of the highly prejudicial "other act" evidence, was binding on him and was a violation of his right to due process and a fair trial under the Sixth and Fourteenth Amendments pursuant to *Murphy v. Florida*, 421 U.S. 794 (1975), and *Irvin v. Dowd*, 366 U.S. 717 (1961).   *Id.*   Applicant concludes that the admission of the highly prejudicial other act evidence so infected the entire trial that the resulting conviction violated his due process rights under *Cupp v. Naughton*, 414 U.S. 141, 147

(1973), and rendered the trial fundamentally unfair under *Lott v. Trammell*, 705 F.3d
1167, 1190-91 (10th Cir. 2013).   *Id.* at 53.

The CCA found as follows regarding this claim:

### C. Jury Instructions Regarding Other Acts Evidence

Defendant next contends the trial court erred by refusing his
tendered instruction regarding the limited purpose of the evidence admitted
under CRE 404(b).   We are not persuaded.

### 1. Trial Court Proceedings

Before trial, the prosecution gave notice of its intent to present
evidence of similar uncharged acts with three other individuals to show
defendant's modus operandi; common plan, scheme, or design; intent;
knowledge; motive; preparation; and grooming behavior and to refute a
defense of fabrication.   Defendant stipulated to the admission of the
evidence for the purposes offered by the prosecution in its notice.
(footnote omitted)

Each party tendered a proposed jury instruction about the limited
purpose for which the Rule 404(b) evidence was admitted during trial.   The
prosecution's proffered instruction, which was based on the stock Rule
404(b) instruction, stated:

> The evidence from [J.O.] about how he and the defendant met
> and how their relationship developed was admitted for the
> specific purpose of showing modus operandi, common plan
> scheme or design, intent, knowledge, motive, preparation,
> grooming behavior, and to refute a defense of fabrication.

Defendant's proffered instruction was also based on the stock jury
instruction, but would have advised the jury:

> The evidence from [J.O.] about how he and the defendant met
> and how their relationship developed and evidence of Mr.
> Vreeland's sexual or other conduct involving anyone other
> [than the victims in this case] or involving any date other [than]
> 10/03 – 10/04[,] 2004 or place other [than] 8770 Wildrye
> Circle, Parker, Colorado, was admitted for the specific
> purpose of showing modus operandi, common plan scheme
> or design, intent, knowledge, motive, preparation, grooming
> behavior and to refute a defense of fabrication.

76

The court gave the prosecution's instruction and rejected defendant's proffered instruction.

### 2. Analysis and Conclusion

We perceive no error.   Defendant's proffered instruction would have advised the jury that it could not consider evidence for purposes that he had stipulated were proper.   Therefore, that instruction was an incorrect statement of the law.   Conversely, the instruction given to the jury correctly stated the limited purposes for which the other acts evidence could be considered.   *See id.*   Thus, the court did not abuse its discretion when it gave that instruction to the jury.

Accordingly, we conclude the trial court did not err when it refused defendant's tendered instruction regarding the limited purpose of the evidence admitted under CRE 404(b).

Docket No. 17-2 at 14-16.

As a general rule, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence.   *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).   The question is whether, "considered in light of the entire record, its admission resulted in a fundamentally unfair trial."   *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (citing *McGuire*, 502 U.S. at 67-68)).   Federal courts may only interfere with state evidentiary rulings when the rulings in question are "so unduly prejudicial that it renders the trial fundamentally unfair. . . ."   *See Lott v.* Trammell, 705 F.3d 1167, 1190 (10th Cir. 2013) (quoting Payne *v. Tennessee*, 501 U.S. 808, 825 (1991)); *see also Tucker v. Makowski*, 883 F.2d 877, 881 (10th Cir. 1989) (state court rulings on the admissibility of evidence are not questioned in federal habeas actions unless they "render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights.") (internal quotations marks and citations omitted).

Applicant concedes that violation of state evidence Rule 404(b) may be a matter of state law, but he claims that the introduction of the highly prejudicial "other act" evidence without the proper limitation resulted in the violation of his due process rights.

The Tenth Circuit "will not disturb a state court's admission of evidence of prior crimes, wrongs, or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies the defendant due process of law." *Hancock v. Trammell*, 798 F.3d 1002, 1038 (10th Cir. 2015) (quoting *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998).

At the preliminary hearing addressing the prosecution's motion for admission of "other act" evidence, the following colloquy took place between the court, prosecution, and Applicant:

> MR. VAHLE: Judge, the other transaction evidence is my motion.    I provided to the court an extensive -- first off, just in the motion and brief setting out of what it is that we think the other transaction evidence should be, and then also I provided copies from discovery of reports and discussions with various people so that the court could have a little fuller understanding of the offer of proof.    Under 16-10-301 the People may proceed by offer of proof and --

> THE DEFENDANT: I don't object to this motion. I want those people here.    So he doesn't have to argue it.    I know exactly what it entails, and I want people here, so I agree.

> THE COURT: Hang on for just a second. I want to make certain we're all clear on this.

> Mr. Vahle is intending to introduce evidence of other transactions in this case.    They are contained in People's Motion -- pardon me, People's notice of intent to admit similar acts.    They are outlined in rough detail in paragraph 3(a), 3(b), and 3(c) of the notice.

> Mr. Vreeland, I want to make certain I understand you.    What you're telling the court is that you're not objecting at this point in time to the admission of that evidence in paragraphs 3(a), 3(b), and 3(c) of the notice of other transaction evidence.

THE DEFENDANT: No, I don't object, your Honor, because once I get the computer evidence, I would have had to subpoena these same people anyway.

THE COURT: All right.   This is evidence being offered for the purposes of modus operandi, common plan to show knowledge, motive, preparation, and grooming behavior, also to refute defenses that may be raised.

I want to make certain that I'm clear on this, Mr. Vreeland.   You're telling the court that you do not object to the People admitting or -- the offering of these items into evidence in front of the jury?

THE DEFENDANT: What they're asking in this motion is basically to bring in [J.O.] and [C.M.]; am I correct?

THE COURT: You need to go to 3(a), 3(b), and 3(c), Mr. Vreeland. 3(a) deals with [C.M.]; 3(b) deals with [L.A.]; 3(c) deals with [J.O.].

THE DEFENDANT: No, I need them here, so, no, I'm not going to object.   I have to have them here.

MR. VAHLE: And, Judge, I just want to make sure that the record is clear as to the distinction between having them here and available to testify and to what it is that we're going to ask them to testify about.

This motion is as to what it is we're going to ask them to say, not as to whether they will be here or not.

THE COURT: I think the notice in itself and the attached documents, including the transcripts of the interviews, the handwritten statements of the individuals, go into detail with respect to their prior contact with the defendant.

Clearly, it's the People's intent, based upon the notice, to offer these witnesses to provide testimony with respect to other transactions.

So it's not merely the fact they're going to be present, Mr. Vreeland. They're going to testify – they're being offered for prior testimony with respect to what's contained in paragraphs 3(a), 3(b), and 3(c).

Do you understand that?

THE DEFENDANT: Well, put it in the light – here's what I'm saying. If what he's asking to do in this motion is he wants to admit their statements without them being here, then I have to object to it.

THE COURT: No, no, no.   He's not offering to have them come into court and --

THE DEFENDANT: I want them in court.

THE COURT: -- let me finish -- and provide the testimony that's outlined in 3(a), 3(b), and 3(c).   It's not a question of them just standing around; they will come in and provide evidence, the People propose, that is consistent with the notice and consistent with the police reports that have been attached.

THE DEFENDANT: And basically what they're doing is testifying to what they have already testified to in their written statements and video statements?

THE COURT: Right, but --

THE DEFENDANT: That's exactly what I want.

THE COURT: Understanding that, Mr. Vahle, is there anything else with respect to a record?

MR. VAHLE: Judge, I understand the court is a little short on time. Even with the stipulation, I would ask the court to briefly make findings on the *Spoto Garner* analysis.

THE COURT: All right. With respect to that then, I think that's probably not a bad position for the court to be placed in because the court has reviewed these items, and I think that Mr. Vreeland has agreed that paragraphs 3(a), 3(b), and 3(c) be admitted.   The court will make an independent determination with respect to those right now, and particularly with respect to 3(a) and 3(b) and 3(c).

What we have is a pattern in which the situation, the testimony, would present itself in each of those paragraphs that the defendant would use another male, and 3(a) it would be [D.G.], 3(b) it was actual direct contact with [L.A.], in 3(c) it was direct contact with [J.O.], that he would in turn offer money to those individuals to have them pose for pictures, he would discuss with them the fact that he had web sites that featured young men, that the individuals would frequently be plied with cocaine and alcohol,

and then there would be -- it would result of sexual contact between the defendant and the three individuals, all who were under the age of 18.

The court notes that there is a similarity between these events, that the items are being offered in this case, as the court has articulated, to show a modus operandi, a common plan, to show knowledge, motive, preparation, and grooming behavior on the part of the defendant to show his state of mind and also to refute any defenses that might exist with respect to consent or the fact that he was unaware of the age of the children in this case.

With respect to that, the court must find pursuant to case law in this case, which is *People v. Spoto* at 795 P.2d 1314, *People v. Garner*, and also based upon the statute of 16-10-301, in which our general assembly has indicated that this type of other activity is typically relevant and highly probative and is -- there is a legislative fiat, if you would, with respect to the admissibility of these items, provided they meet the requirements of *Spoto* and *Garner*, which is the evidence must be relevant to a material fact, the evidence must be logically relevant, it must have a relevance independent of defendant's bad character, and the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.

With respect to each of the three incidents, the court notes and incorporates the statements that were made by the individuals that are attached to the People's notice that the evidence is being offered to establish, as the court indicated before, that there is a method of operation, or a common plan, that involves the defendant having sex with young men, usually with cocaine or alcohol being involved, and starting out initially with photographs being taken of the young men for a Website, the young men being offered money to pose for those photographs.

There's a modus operandi, or common plan here, that also goes to the defendant's state of knowledge, his motive, preparation, and grooming behavior.

The evidence must be logically relevant.   The court will find that the evidence offered under each of these three circumstances is logically relevant.   The court will also find that with respect to [L.A.] and [J.O.] that these also occurred close in time to the events that are alleged to have taken place in this case, and I think also to a certain extent are a part of the *res gestae* of the events that occurred involving [J.R.] and [N.M.], the two alleged victims in this case.   The court will find that the evidence is relevant to the issues the court has just raised.

81

The evidence must have a relevance independent of the defendant's bad character.   The court will find that it does, in fact, have relevance independent of the alleged bad character of the defendant in that it goes to the issues the court has just previously articulated.

And the court will find that the probative value of the evidence is not substantially outweighed with the danger of unfair prejudice.   Certainly any evidence offered by the People against the defendant is being done to further their case and prejudice the defendant.   The question has to do with unfair prejudice.

In this case the court has found that there is an argument with respect to the method of operation, or common plan, knowledge, motive, preparation, grooming behavior, state of mind of the defendant, and to refute the defenses, and the court finds that that is something that outweighs the danger of any unfair prejudice.

So based upon the defendant's statements to the court today and the court's own review of the records and findings just made, the court will admit the other transaction evidence being offered in paragraphs 3(a), 3(b), and 3(c) of the People's notice.

Feb. 8, 2006 Hr'g. at 38-44.

At the time of J.O.'s testimony, the colloquy between the trial court, the

prosecution, and Applicant was as follows:

THE DEFENDANT: I'd like to know how they're going to proceed with him on this?   The problem that I have is -- I didn't bring it up before, because he was bringing up him and [C.M.].   Now, we know [C.M.] might not make it here, so I've offered that maybe we'll stipulate on something as far as he goes, but we'll – we'll get to that later.

But I don't see how he can offer [J.O.] as a 404(b) witness based on what he just said when all these alleged acts, if they took place, they took place in another country, which is Canada; and in that country, it wouldn't be a bad act, it would be 100 percent completely legal.   I mean, even the drinking age there is 18 and 19, depending on the province that you're in, it bounces from each one.

So he's trying to say that these are bad acts and it's wrong and it's a crime.   Well, it might be wrong or a crime here, but -- if it happened here; but the problem is is that it didn't happen here.   [J.O.'s] never stated in any interview that anything has ever happened with him in the United States of

America.   His testimony was, in fact, that one time four years ago in Canada something happened, but after that, that was it.   We've been roommates ever since.

So I don't see how there's any modus operandi in there.   I don't even see any prior bad act because there's nothing illegal there.   If it was to take place, the age of consent there in Canada is definitely 16 years old, so it wouldn't make a difference if he's already testified right here in the court that he was 17 when he met me.

Excuse me? Okay.

Everything he just said he was entering this upon would be based upon some form of illegal act, whether it was in this country, or maybe in another, or it would be based on basically an illegal act in this country.   But if he has no offer of proof to prove that there was an illegal act that he can prove to show --excuse me.

(Pause.)

THE DEFENDANT: I'll try to word it the way that – I'll try to word it this way, it's better.   If the act that [J.O.] testifies of -- testifies to was not an illegal act, then [J.O.'s] testimony to that shouldn't be used as 404(b).   If [J.O.] -- because the prejudice against me with the jury outweighs the probative value.   And [J.O.'s] already made it clear that nothing's ever happened in this country.   He's made it abundantly clear that he has absolutely no knowledge of this case and any activity between myself or [J.R.], specifically, at all.   He's made it very clear in two videotapes, and then in another videotape he says, well, maybe this may have happened, but he doesn't know.

So I don't have a problem with [J.O.] testifying, but to anything that may have happened out of this country, if it's not illegal, then I don't think Mr. Vahle should be able to enter it to the jury and say, well, it's bad here, so it has to be bad if he did it there.

If the speed limit is 90 miles an hour down QEW in Toronto and the speed limit here is 60 miles an hour, I don't think that I'm breaking the law and they can't use me speeding over there here to prove to the jury that I did something bad here, you know?   Everything that he's using for [J.O.] is irrelevant when it comes to 404(b), and I don't think they're going to be able to bring [C.M.] in at all.

THE COURT: With respect to this, the court has previously ruled on this issue.   Mr. Vreeland has previously confessed the admissibility of this

> evidence.   The court need make no further record with respect to this.
> The court independently found this – these matters to be relevant pursuant
> to 404(b).   The defendant himself confessed the admissibility of these
> items, so we're not here debating that point.

Nov. 30, 2016 Trial Tr.at 158-161.

Prior to the prosecution's direct examination of J.O. that addressed any "other act"

evidence the trial court gave the following limiting instruction to the jury.

> THE COURT: All right. Ladies and gentlemen of the jury, certain
> evidence may be admitted for a particular purpose only and for no other.
> The evidence you are about to hear is of such nature.   It may be used as
> evidence for the purpose of showing modus operandi; common plan,
> scheme, or design; knowledge; motive; intent; preparation; grooming
> behavior; and to refute a defense of fabrication.   Thank you.

*Id.* at 177.

No limiting instruction was given at the time L.A. testified.   Dec. 5, 2006 Trial Tr. at

10-41 and 65-70.   However, the Court notes the trial court found, as stated above, when

granting the prosecution's motion regarding admissibility of "other act" evidence, that

> with respect to [L.A.] and [J.O.] that these also occurred close in time to the
> events that are alleged to have taken place in this case, and I think also to a
> certain extent are a part of the *res gestae* of the events that occurred
> involving [J.R.] and [N.M.] the two alleged victims in this case.

Feb. 8, 2006 Hr'g at 43-44.   As stated by the CCA, the instruction Applicant submitted

would not have allowed the jury to consider L.A.'s testimony as part of the "*res gestae*" of

the events that pertained to the two victims.   The Court also notes that, to the extent

Applicant argues he naively agreed to the admission of highly prejudicial "other act"

evidence, such argument is without basis.   As set forth above, Applicant was specifically

instructed by the trial court about the purpose of the prosecution's motion seeking

admission of "other act" evidence and adamantly claimed he understood the prosecution's request and agreed to it.

Based on the above findings, the CCA decision regarding Applicant's jury instruction claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   This claim, therefore, lacks merit and will be dismissed.

## III.   CONCLUSION

In summary, the Court finds that Applicant is not entitled to relief on any of his remaining claims.   Accordingly, it is

**ORDERED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, Docket No. 8, is denied and this case is dismissed with prejudice.   It is further

**ORDERED** that there is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).   It is

**ORDERED** that leave to proceed in forma pauperis on appeal is denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith.   *See Coppedge v. United States*, 369 U.S. 438 (1962).   If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a

motion to proceed in forma pauperis in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED December 20, 2016.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge